14631

## BUNTON v. SOUTH CAROLINA STATE HIGHWAY DEPARTMENT (two cases)

(196 S. E., 188)

April, 1937.

*Messrs. John M. Daniel, Attorney General, J. Ivey Humphrey* and *M. J. Hough, Assistant Attorneys General* and *Nathans & Sinkler,* for appellant,

*Mr. J. C. Long,* for respondent,

March 7, 1938.

The opinion of the Court was delivered by MR. CHIEF JUSTICE STABLER.

These two cases, the issues involved being identical, were tried together in the Court below, and so argued on appeal here. In both actions the plaintiffs sought to recover damages for injuries sustained as a result of an automobile accident which occurred on June 11, 1935, some four miles southwest of Charleston on State Highway No. 17 leading to Savannah. Originally, the concrete part of this road was 18 feet in width; but it had been widened, for several miles from Charleston to the point of the accident, by the addition of a five-foot strip of concrete paving on each side thereof. About noon of the date mentioned, the plaintiff, Mrs. Christina Bunton, left Charleston on this highway for Savannah,

in a Ford automobile driven by her. She was accompanied by her daughter, Miss Christina Bunton, and three other women. On her approach to the end of the widened paving, Mrs. Bunton, who apparently was driving to the extreme right, attempted to shift or steer the automobile to the left onto and entirely upon the original 18-foot paved road, which continued from that point; but, in her effort to do this, one of the right wheels of the car left the concrete surface and hit a hole or rut adjacent to the northern side of the 18-foot pavement; that is, on the right-hand side in the direction in which the car was being driven. When the wheel left the concrete, the driver, according to her own testimony, lost control of the Ford. It zig-zagged to the left across the highway, hitting the display sign of a filling station a little beyond the left of the southern shoulder of the road; it then started back in the direction of the pavement, crashed into a telegraph pole and turned over, thus coming to a full stop about 185 feet from the hole or rut.

The plaintiffs alleged that the rut or hole in question constituted a defect in the highway, and that the defendant was negligent and careless in allowing it to be and to remain there. Also, in "failing and omitting to have maintained and kept a proper inspection of its highway," and in failing "to have properly constructed the said highway" at the place of the accident.

The defendant, while admitting the existence of a slight rut at the end of the widened portion of the concrete, maintained that this did not constitute a defect in the highway; denied all allegations of negligence and carelessness on its part, and alleged that the injuries sustained, if any, were due to the plaintiff's own negligence and the negligence of the operator of the car, the occupants thereof being engaged at the time in a common enterprise; that the highway was in suitable condition to meet the needs of a person exercising due care; and that the accident occurred when the driver lost control of the car, which was due either to her own negligence or to the defective condition of the automobile itself.

At proper stages of the trial, the defendant moved for nonsuits and for directed verdicts. The motions were refused, and the jury found for each plaintiff the total amount asked for by her; to wit, in the action brought by Mrs. Bunton, $300.00, and in the suit by Miss Bunton, $2,500.00. In the last-named case, the presiding Judge held that the verdict was highly excessive, and granted the defendant's motion for a new trial unless the plaintiff remitted on the record, which she did in the time allowed, all in excess of the sum of $1,250.00.

Three questions are presented by the appeal: (1) Should the defendant be required to respond in damages for injuries sustained in an automobile accident, where the alleged defect in the highway is not in, but on the side of, the paved portion thereof? (2) Did the Court commit error in refusing to direct a verdict for the defendant? (3) Was there error in the refusal of the trial Judge to charge that a quotient verdict is illegal? These we will consider in the order named.

First. It seems, as suggested, that this direct question has not been passed upon heretofore by this Court.

The argument of appellant is that the central paved portion of the highway is that part of the right of way intended for vehicular traffic, and that its legitimate use by motor vehicles, under normal circumstances, means that such type of traffic should proceed on the concrete surface; that the sole duty imposed upon the State Highway Department is to keep those portions of the highway in reasonably safe condition and free from defects for the respective use of the various types of traffic for which they are designed; and that, in the case at bar, as the plaintiff, although no unusual circumstances existed, drove her automobile off the paved highway into the rut or hole adjacent thereto—the pavement at that point being 18 feet in width—the defendant, under the reasonable rule contended for, is not liable in damages for any injuries that she may have received thereby.

In *Livingston v. State Highway Department,* 178 S. C., 323, 183 S. E., 8, 10, the plaintiff, while traveling on foot, was injured by a defect in the road. One of the questions there had to do with the rights of pedestrians in and to the use of the highways. In its disposition of that issue, the Court, speaking through Mr. Justice Fishburne, stated certain conclusions which we think are helpful as having a bearing, directly or indirectly, upon the question now before us. We quote: "The appellant contends, further, that it is not liable for injuries suffered by reason of defects in its highways or by reason of the negligent repair thereof, unless such injuries occur on the part of the highways maintained for travel (that is, the paved portion), or in such close proximity thereto as to be unavoidable to one using the traveled part; and that, consequently, defendant is not liable for injuries sustained on the right of way of its highways, nor on or near private paths or ways."

Again: "By grading and placing in condition for travel the unpaved shoulder portion of the highway, the appellant must be held to have impliedly invited travel by the public. The section of the Code under which this action was brought does not limit the right of the traveling public to the paved portion only of the highway."

Also: "The appellant contends that the traveling public, pedestrian and vehicular, should be confined to the use of the paved central strip or the paths running immediately alongside thereof. The adoption of this rule, certainly as to pedestrians, would be unjustified in the light of experience, and in view of present-day traffic conditions upon our highways. There is an ever-present danger to the foot traveler upon the pavement from all manner of motor vehicles, moving with every variety of speed. Pedestrians in the lawful use of state highways, especially at night, should not be restricted within such narrow limits unless the statute clearly requires such construction, and we find no provision therein which would warrant us in so holding. If they took counsel of wisdom, or had due regard for life and limb they would steer a rea-

sonably safe course from the paving and from the traveled path which runs in such deadly proximity thereto."

And: "We do not say that the liability and duty of the appellant to keep its highways in a reasonably safe condition for travel, free from defects, and in reasonably good repair, extend to the uttermost width of its right of way. The law, however, does require the appellant to maintain in a reasonably safe condition for travel that portion of its roadbed which is set aside and maintained in such condition as to invite its use for travel by the public, whether paved or unpaved."

From a reading of the above quotations, it is seen that the defendant sought in the *Livingston case* to have this Court declare that the State Highway Department was not liable for injuries suffered by reason of a defect in a State highway, unless such defect occurred in the paved portion thereof or in such close proximity thereto as to be unavoidable to one using the traveled part. The Court, while not making any direct holding as to vehicular traffic, refused to sanction such suggested rule as to pedestrians, saying that this class of travelers upon highways, if they took counsel of wisdom, "would steer a reasonably safe course from the paving and from the traveled path which runs in such deadly proximity thereto." On the whole question, however, it was held that the defendant is required to keep in reasonably safe condition for travel that portion of its roadbed, whether paved or unpaved, set apart and maintained for travel thereon by the public.

Upon consideration, we think the appellant is right in its contention that the paved portion of a highway, and not the shoulders thereof, is the lane of travel which motor vehicles are primarily intended to follow and to be operated upon; and this is especially true where the pavement is of sufficient width to easily accommodate the vehicular traffic moving upon it. It would be laying down too strict a rule, however, if not an unreasonably harsh one, to hold that the driver of a motor vehicle on a paved highway may not, under any

circumstances, turn from the pavement to the shoulder of the road, to such an extent as an emergency or the circumstances might require, without being guilty of negligence as a matter of law. In view of present-day vehicular traffic upon the highways, a number of reasons might be given for the leaving of the paved portion of the road and passing, to some extent at least, to the shoulder thereof by a motor vehicle without any fault on the part of the driver. The State Highway Department, whose duty it is to keep the highways in reasonably safe condition for travel, is fully cognizant of such reasons. We hold, therefore, that the duty rests upon the defendant to not only keep the paved portion of the road in reasonably safe condition for .motor vehicle travel, but also to keep the road adjacent to the pavement, the shoulders of the highway, in such condition as will meet the reasonable needs of motorists as above indicated.

Of course, as pointed out by the appellant, many ruts exist in the shoulders of the paved roads of this State, and are imperfections of an everyday character. The State Highway Department is not an insurer of the safety of travelers over its highways; and when a motorist leaves the paved portion of the road and drives along the shoulder, or some part thereof, the danger to his safety is thereby increased, and in such situation he is required to exercise a higher degree of care than when driving upon the paved part thereof. In other words, he must exercise due care in the circumstances. The facts of each case, of course, will necessarily govern and control as to such case.

Second. The motion for a directed verdict was made on two grounds, the first of which was as follows: That there was no proof of any actionable negligence on the part of the defendant.

Section 5887 of the Code of 1932 provides that "any person, firm or corporation who may suffer injury to his or her person or damage to his, her or its property by reason of a defect in any State highway, or by reason of the negligent repair of any State highway * * *

may bring suit against the State Highway Department for the actual amount of said injury or damage not to exceed in case of property damaged the sum of fifteen hundred dollars, and in case of personal injury or death, not to exceed the sum of Four Thousand ($4,000.00) Dollars." And that "any person, firm or corporation bringing a suit against the State Highway Department must allege and prove that he, she or it did not bring about the injury by his, her, or its own negligence, nor negligently contribute thereto."

This Court has pointed out in a number of cases that the plaintiff, in order to recover in an action of this kind, must "prove by the preponderance of the evidence that defendant was guilty of the acts of negligence, or one or more of them, charged against it," and that "such act or acts of negligence was, or were, the proximate cause" of plaintiff's injuries; and that the plaintiff must also allege and prove that he did not bring about his injuries by his negligence, nor did he negligently contribute thereto. *Cooper v. South Carolina Highway Department,* 183 S. C., 155, 190 S. E., 499, 502; *Hunsucker v. State Highway Department,* 182 S. C., 441, 189 S. E., 652.

With these principles in mind, we turn to an examination of the testimony pertinent to the first ground of the motion. All five of the women riding in the Ford at the time of the accident testified on trial of the case. On this point, however, their testimony is not helpful. While stating that the car ran into a rut on the side of the concrete pavement, turned to the left and "shimmied" across the highway and struck a telephone pole and turned over, none of them gave any definite information about the rut or hole—its depth, size, etc.

A. D. Moore testified that he made some photographs of the place, enlargements of which were introduced in evidence, on the afternoon of the day of the accident. When asked why some of the pictures showed the depression deeper at some points than at others, his answer was, "This is exactly the same point but it is closer"; and that the apparent difference in depth was due to the distance the witness was

standing from the rut or depression at the time he took the picture.

Two eyewitnesses to the accident testified for the plaintiffs. M. B. Hogan said that he lived nearby and saw the accident occur; that the hole or rut the wheel of the Ford went into was about 3½ or four inches deep, about 10 or 15 feet in length, and tapered off at the end. When shown a photograph made by Moore of the place of the accident, the witness stated that it looked a good bit like the rut, but looked deeper than it really was. L. L. Barden testified that his place of business was near where the widened pavement ended, and about three-fourths of a mile from the station of the highway department; that the hole or rut which the wheel of the Ford struck was about eight inches deep; that some time after the defendant had finished its work in placing the additional concrete strips, the witness phoned the maintenance officer of the highway department—although he could not recall the name of the man he talked to—with reference to the bad condition of the roadbed at that point; that "they put some loose dirt in there, and I told them unless they put asphalt in there, it would whip out again. I filled it up myself one time"; that he phoned them again about two weeks before the accident occurred, but they had not yet filled up the hole at the time the plaintiff's car went into it.

■ The trial Judge properly refused to direct a verdict on this ground. Under the pertinent evidence, which was in sharp conflict, the question of actionable negligence was an issue of fact for the jury.

The second ground of the motion was as follows: "That the testimony shows that the contributory negligence on the part of the plaintiff was the proximate cause of this accident, and the injury resulting therefrom." In considering this ground, it should be kept in mind that the plaintiff is required by the Act permitting her to sue to allege and prove that she did not bring about the injury by her own negligence, "nor negligently contribute thereto." In other words, the burden

was on her to show, in a case of this kind, that she was free from negligence as a proximate cause of her injuries.

Mrs. Bunton, the operator of the car, stated that when she left Charleston, about midday, June 11, 1935, she was driving about 35 miles per hour, but before reaching the place where the accident occurred, but near it, she slowed down to 15 or 20 miles, and that she did so because she saw the crossing sign and the railroad sign; that nothing attracted her attention until the right rear wheel of the car was caught in the rut; that she had driven over this road a short while before when she came to Charleston on her trip, but that she did not then especially observe the road; that at the time of the accident, it had just started sprinkling rain, but the pavement was not wet; that there was gravel in front of the filling station, but the witness did not see it until after she struck the rut; and that she lost control of the car after it got into the rut, and when she tried to turn it to the left, it began to shimmy or dance, and she never got it under control after that. Mrs. Smith testified that she was sitting on the right side of the back seat of the Ford, and that the first thing that attracted her attention was when the back wheel ran into the rut, and that at the time they were traveling about 20 miles per hour. On cross examination, she stated that on their trip over a short time before, Mrs. Bunton drove the car from Ridgeland to Charleston; and that at the time of the accident it was cloudy and raining a little. Mrs. Ferrera testified that she was sitting beside the driver, and the first thing that attracted her attention was the going into the rut; and that immediately prior to the accident they were traveling between 30 and 35 miles per hour, but at the time they went into the rut had slowed down to about 15 or 20 miles. She further stated, on cross examination, that the road where the accident happened was perfectly straight. Mrs. Cone stated that she was sitting on the left-hand side on the back seat, and that she did not notice anything unusual before the car struck the rut and bounced across the road; that they were traveling prior to the accident between 30 and

35 miles per hour, but had slowed down at the time they went into the rut to maybe 15 or 20 miles. Miss Christina Bunton testified that she was sitting on the back seat of the Ford reading a magazine, and the first thing that attracted her attention was she felt the car sway, and immediately thereafter it turned over.

The pertinent testimony of Barden, plaintiffs' witness, was to the effect that he saw the accident and saw when the Ford "hit the hole and kind of bounced a little, and it seemed like they lost control, and cut quick, and it turned over on the side"; that he noticed the car about 25 or 30 yards before it went into the rut; that "as soon as it went into that place, and the lady got it back on the highway, that is when it got out of control"; that it began to shimmy and went across the road beyond the shoulder and hit a telephone pole and turned over; that the automobile was going at the time, the witness thought, about 35 or 40 miles per hour, and from the time it hit the hole until it turned over, the speed of it was slackened very little; that if the driver had kept on following the rut when the car went into it, she would have come to a place on the shoulder level with the pavement; that it was raining some at the time, but not hard, and the ground was wet very little. Plaintiff's witness Hogan stated that you could see what happened to the car for a distance of 300 feet; that it was easy to see where the concrete strip ended, and no reason why a person could not do so; that the automobile was going about 30 or 35 miles per hour; that from where he was sitting on his piazza he could not tell whether both right wheels got off the pavement or just one, but that when the car came out of the place, it crossed the road and collided with a telephone pole and turned over; that if any one going into that rut would just follow it, he would find no trouble in getting back on the road, but if the operator should suddenly jerk the wheel to the left it would cause an accident, and that would certainly be true if he did not keep his head, and that it appeared to the witness that the driver of this particular car got a little excited when she got into the rut;

that the distance from the rut to the telephone pole was about 180 to 185 feet.

On the whole, the testimony shows that Mrs. Bunton, the operator of the car, offered no reason for driving into the rut alongside of the pavement, or that it was necessary for her to do so in the circumstances, but contented herself with merely stating that nothing attracted her attention until she drove into the hole. According to testimony which she offered herself, if she had looked, which was her duty as driver to do, she could have easily seen where the widened pavement ended. One of her own witnesses, who was familiar with the place, testified that any one looking could easily see that the widened pavement did not extend any further than it actually did. The road at the point of the accident is straight for quite a distance, the narrowest part of the paved lane being 18 feet, the regular standard width, which continued on towards Savannah from where the widened pavement ended. There was no evidence that visibility was not normal; it was midday, and while it was sprinkling rain, the driver of the car stated that the pavement was not wet; and neither Mrs. Bunton, nor any one else, testified that, at the time of the accident, travel at this point was congested; or, in fact, any other car or motor vehicle was approaching or passing by.

In these circumstances, nothing else appearing, the only reasonable inference to be drawn from the testimony, to which we have given much thought and consideration, is that Mrs. Bunton, the driver of the car, failed to exercise due care in her approach to the point of the accident, and that the injury sustained by the plaintiffs in the two actions here brought were due to the negligence of such driver as a proximate cause thereof. Certainly, the contributory negligence of the driver barred recovery on the part of the plaintiffs. In the case of Mrs. Christina Bunton, therefore, a verdict should have been directed for the defendant on the second ground of its motion. As to the case brought by Miss Christina Bunton, the trial Judge held that

the occupants of the car, of which Miss Christina was one, were engaged at the time of the accident in a common enterprise. As no appeal was taken from this holding, it became the law of the case, and the negligece of the driver of the car was imputed to Miss Bunton. A verdict for the defendant, therefore, should have also been granted in that case.

Third. The defendant asked the trial Judge to charge the jury as follows: "I further instruct you that the so-called quotient verdict is improper. A verdict is the meeting of the mind of all twelve members of the jury. Before a verdict can be rendered for either plaintiff or defendant, the twelve men comprising this jury must agree that a verdict must be had for one or the other. If it happens in this case that you determine that the plaintiff should recover, I charge you further that before you bring in a verdict for her, there must be a further agreement on the part of each of you as to the sum she should be awarded. It is improper for each of you to fix in his own mind a sum, arrive at a total and divide by twelve. This is not a verdict that has the approval of our Courts." Judge Johnson refused to charge as requested, for the reason, as stated by him in his order denying a new trial, that he could not do so under certain decisions of this Court.

On this question, in *Carson v. Southern Ry.*, 68 S. C., 55, 46 S. E., 525, 535, the Court had this to say: "We think the circuit judge very properly refused to charge the quotient verdict would be illegal. Never suggest evil to a jury. Let them understand that 12 jurors must agree to a verdict, and that such verdict must be based upon the law and the evidence. It was within the Judge's discretion, at any rate." The question was before the Court again in *Reeves v. Southern Ry.*, 68 S. C., 89, 46 S. E., 543, 545, and was disposed of in this language: "Did the circuit judge err in refusing the request to charge concerning quotient verdicts? The request was as follows: 'A quotient verdict is illegal.' The request simply contained a warning to the jury, and, even conceding

that it was a sound proposition, there is nothing in the record showing that the appellant suffered prejudicial injury by reason of the refusal to so charge."

In the more recent case of *Wannamaker v. Traywick,* 136 S. C., 21, 134 S. E., 234, 236, where the appellant complained of error on the part of the presiding Judge in refusing his motion for a new trial on the ground that the verdict of the jury was a quotient verdict, the question was treated at some length. Associate Justice Blease, later Chief Justice, who wrote the opinion of the Court, after quoting from *Carson v. Southern Ry., supra,* said: ".'While, as stated, there has been no direct holding, so far as we now know, that a quotient verdict is illegal, we are inclined to the view that the cause last cited tends to indicate that a verdict of that kind should not be allowed. This seems to be the law in other jurisdictions. 27 R. C. L., 847, § 20. It seems, however, from the *Carson* and *Reeves cases, supra,* that it is not proper that juries in our courts should be charged not to find a quotient verdict, and certainly that it is within the discretion of the presiding judge to refuse to so charge."

Upon consideration, we hold, in line with the rule stated in other jurisdictions, that a quotient verdict is illegal, and that where it is clearly shown that the verdict rendered is such a one, it should not be allowed to stand. We see no good reason, however, to require the trial Judge to charge the jury with regard thereto; but we hold that, in the exercise of a wise judgment, he may properly do so, it being a matter entirely in his discretion. Any holding of this Court contrary to the views here stated is expressly overruled. In the case at bar, Judge Johnson committed no error in refusing to charge as requested.

The judgment of the Circuit Court in each of the cases is reversed, and both cases are remanded to that Court, with instructions that judgment be entered up for the defendant in each of them under Rule 27 of this Court.

MESSRS. JUSTICES BONHAM, BAKER and FISHBURNE concur.