15127

WESTBROOK v. HUTCHISON *ET AL.*

(10 S. E. (2d), 145)

December, 1939.

*Messrs. Hart & Moss* and *B. J. White,* for appellants,

*Messrs. R. B. Hildebrand* and *Dunlap & Dunlap,* for respondents,

July 15, 1940.

The opinion of the Court was delivered by MR. L. D. LIDE, ACTING ASSOCIATE JUSTICE.

This is an action for false imprisonment, the occurrence complained of having taken place on July 5, 1937, and the action was commenced on August 7, 1937, in the Court of Common Pleas for York County. The case first came on for trial before Judge Gaston and a jury on May 6, 1938, and resulted in a directed verdict in favor of defendants as to punitive damages; but a mistrial was ordered as to actual damages. An appeal was taken by the plaintiff as to punitive damages, but was afterwards abandoned, thus eliminating the claim of punitive damages. On December 5, 1938, the cause again came on for trial, Judge Featherstone presiding. From his order granting a nonsuit the case came to the Supreme Court, and resulted in a reversal, pursuant to which the cause was remanded for a new trial as to actual damages. See *Westbrook v. Hutchison,* 190 S. C., 414, 3 S. E. (2d),

207, wherein the opinion was delivered by Mr. Justice Baker; and it contains a very lucid and adequate statement of the legal principles involved, which are applicable to certain issues raised in the instant appeal. While the facts are quite sufficiently stated there for the purposes of that appeal, the Court expressly refrained from going into detail because the case was remanded for a new trial; which was had before Judge Bellinger and a jury on December 7, 1939, resulting in a verdict in favor of plaintiff, from which the instant appeal is taken.

The complaint herein sets forth in detail the facts upon which the charge of false imprisonment was based, alleging that the defendants conspired together, aiding and abetting each other; but it is also alleged that each of the defendants "individually and collectively, willfully and maliciously imprisoned, detained and restrained the plaintiff of his liberty," to his damage in the sum of $5,000.00. The defendants answered jointly, and in effect the answer is a general denial. Justification is not pleaded, nor is there any other affirmative defense.

The plaintiff, an infant, was then eleven years of age. He lived with his father and mother in the City of Rock Hill, just across the street from the residence of the defendants. On the date in question, to wit, July 5, 1937, the defendant, Mrs. Kate J. Hutchison and her daughter, the defendant, Miss Kate J. Hutchison, returned to their home after a visit to Myrtle Beach. During their absence the home had been occupied by David Hutchison, a son of Mrs. Kate J. Hutchison, and when they got back he told them that he had seen the plaintiff, Jimmie Westbrook, coming out of the Hutchison home that morning, and that some time after that he had discovered that $21.25 in money, representing rents which he had collected for Miss Kate J. Hutchison, was missing. Shortly thereafter Miss Kate J. Hutchison went over to see Mrs. Westbrook, the mother of the plaintiff, telling her that some one had cut the side screen door and got

into her mother's room and had taken this amount of money out of the dresser, and that her brother David had seen Jimmie coming out of the back door. (It should be observed here that the statement in regard to the screen door was admittedly inaccurate, because David Hutchison testified that he had previously cut the screet door himself, and the plaintiff denied having entered the Hutchison home, but said that as he was walking through the Hutchison yard on his way from the home of one of his playmates on that morning he did see David Hutchison.) Mrs. Westbrook told Miss Hutchison that her children were at the picture show, but that as soon as they came in she would make inquiry about the matter.

Instead of waiting to hear from Mrs. Westbrook, however, the defendant, Mrs. Eunice Hutchison, wife of the defendant, W. C. Hutchison, drove her automobile to the picture theater where the plaintiff and his little brother Bobbie were, and had them called out, stating to Jimmie that "Kate" wished to see him. She took the children in her automobile to the Hutchison home, and they came with her through the side entrance into the bedroom of Mrs. Kate J. Hutchison. There were present in the room all four of the defendants, except that the defendant, W. C. Hutchison, went in and out during the time the children were there. Jimmie Westbrook, the plaintiff, was then and there subjected to what might be termed an inquisition with reference to the missing money. He testified as follows: "Miss Kate Hutchison said it would be best if we would give her the money, and she would not say anything about it; and we told her we did not get the money. And they kept on asking the same questions, about twenty minutes. Later, my little brother and I started to leave, and she (Mrs. Kate J. Hutchison) told us, 'You step back there; we are not through with you yet,' and so we stepped back."

He also said that all of them took part in the conversation, and that he meant by all of them Mrs. Kate J. Hutchison,

Miss Kate J. Hutchison, and Mrs. Eunice Hutchison; and he also said, "Well, they all asked if I would give them the money, and they wouldn't say anything about it."

With reference to the defendant, W. C. Hutchison, the plaintiff testified that "he would keep going in and going out"; and also: "He would come in the bedroom and go out."

Neither of the parents of the plaintiff nor any of his relatives were present, or knew anything about this "inquisition" at the time it occurred, except his nine-year-old brother, Bobbie.

The plaintiff further testified that during the course of the interrogation he was asked if he had gotten the money and given it to his elder brother, Ed Westbrook, Jr., for whom he worked as a newsboy, and that he told them he had not taken the money or given it to his brother, Ed. It appears that it was then decided by the defendants that they would go and see Ed, who was attending a baseball game at a ball park some distance from the Hutchison home; so the defendants, Mrs. Eunice Hutchison and Miss Kate J. Hutchison, took the two Westbrook children in the car, driven by Mrs. Eunice Hutchison, and they first drove to the Highland Ball Park, and, not finding Ed there, then drove to the Aragon Ball Park, where they interviewed him.

Plaintiff testified that when he saw his brother Ed on this occasion the following took place: "Well, I told him that Miss Kate Hutchison wanted to see him; and we went back to the car. And Miss Kate Hutchison said, 'Ed, I wish you would give me that money that Jimmie has stolen from me, over out of my house.' And Ed said that 'Jimmie hasn't given me any money; and I don't think he has stolen any money'."

This older brother of the plaintiff testified that he requested the defendants not to mention the matter to his father because he knew it would upset him, his father being sick, and that he said he would come over and try to settle it.

Jimmie and his little brother were then taken to a point within a short distance of the picture show which they had been attending and were left there, being informed by Mrs. Eunice Hutchison that they could return to the show and tell those in charge that she said to let them back in. It appears, however, that they were not allowed to re-enter the show, and that they then walked home.

During that afternoon Ed Westbrook, Sr., father of the plaintiff, went over to the Hutchison home and had an interview with Mrs. Kate J. Hutchison and W. C. Hutchison in regard to the matter, and in the course of their conversation, according to the testimony of plaintiff, Mrs. Kate J. Hutchison said that they did not have the plaintiff arrested because "she did not have proof."

The foregoing statement is based largely upon the testimony of the plaintiff, and it should be said that the testimony of the defendants discloses some conflict in the evidence, but very little as to the outstanding facts. The divergencies relate mainly to the inferences to be drawn as to intent, motive and purpose, the contention of the defendants being that there was no coercion and that they exercised no restraint over the plaintiff and that he acted freely and voluntarily in every respect.

At the conclusion of the testimony in behalf of the plaintiff a motion for a nonsuit was made and refused, and at the close of all the testimony a motion for a directed verdict was likewise made by defendants and refused. The jury found in favor of plaintiff in the sum of $3,000.00 "actual damages and costs." Thereafter a motion for a new trial was duly made and refused; and the cause comes to this Court upon 22 exceptions, which are reduced by counsel for the appellants in their statement to nine issues; but by further grouping and consolidating we think they can appropriately be reduced to six questions, each of which will be discussed by us.

(1) The first question arises on the refusal of the motions for a nonsuit and directed verdict, and is: Did the trial Judge err in submitting the case to the jury?

In this connection, it might be sufficient simply to refer to the decision of this Court on the former appeal, for it is not questioned that the evidence at this trial was substantially the same, so far as the plaintiff's case is concerned, as it was at the trial before Judge Featherstone. Hence it follows that under the law of the case as thus settled neither a nonsuit nor a directed verdict could have been granted. *Smith v. Southern Railway,* 96 S. C., 153, 79 S. E., 1099.

But aside from this, it is quite apparent from the foregoing statement of the evidence that there was ample testimony requiring the submission of the cause to the jury on the question of whether the plaintiff had been unlawfully restrained of his liberty. For the law, as quoted with approval in Mr. Justice Baker's opinion on the first appeal, is as follows [190 S. C., 414, 3 S. E. (2d), 209] : "The wrong may be committed by words alone, or by acts alone, or by both, and be merely operating on the will of the individual, or by personal violence, or by both. It is not necessary that the individual be confined within a prison, or within walls, or that he be assaulted, or even touched. It is not necessary that there should be any injury done to the individual's person, or to his character, or reputation. Nor is it necessary that the wrongful act be committed with malice, or ill-will, or even with the slightest wrongful intention."

The following statement from 22 Am. Jur., 361, is likewise an apt statement of the governing principles : "The use of force is not necessary to constitute false imprisonment. Any genuine restraint constitutes an actionable imprisonment although effected without actual contact with the person. The essential thing is the restraint of the person. This may be caused by threats, as well as by actual force; and the threats may be by conduct or by words. If the words or

conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectually restrained and deprived of liberty, as by prison bars."

One of the grounds of the motions is that the complaint was based upon a conspiracy, and that the evidence failed to show such, but as was well said in the former opinion, "There is testimony from which a reasonable inference can be drawn that the respondents [defendants] were acting in concert." And we also direct attention to the fact that while the complaint does allege a conspiracy it also explicitly charges the defendants with the delicts "individually and collectively."

It is further contended that as to the defendant, W. C. Hutchison, there is no testimony to show his participation; but the evidence shows his presence as the only man in the group and that he went in and out of the room during the course of the investigation; and that he was well aware of its purpose. Moreover, the inquiry was being conducted not at his own home but at the home of his mother. We think the circumstances were quite sufficient to warrant the inference by the jury that he was a participant in the whole transaction.

The motion for a directed verdict was based upon the same grounds as the motion for a nonsuit, except there was an additional ground to the effect that the undisputed testimony shows that the purpose for which Jimmie Westbrook was held was to take him to a magistrate or other officer, and that this would have been done except for the statement of Ed Westbrook, Jr., that he would come over there that night and see them and straighten out the matter. This ground is rather surprising in view of the repeated assertions by the defendants that they did not arrest the plaintiff or restrain him in any manner whatever, and the record shows that nothing was said at that time by any of the defendants with reference to taking the plaintiff to a

magistrate or other officer. Besides, there was no plea of justification whatsoever. However, even if the failure to plead justification may be held to have been waived, the defendants were really given the benefit of the plea, because Judge Bellinger charged the jury correctly and in detail with reference to the right of private persons to make an arrest; and under no view of the case would the defendants have been entitled to a directed verdict on any such issue. This brings us to the second question raised by the appeal, which is:

(2) Did the trial Judge err in his rulings relating to Section 907, Code, 1932, in regard to arrest by a private person?

As we have already said, Judge Bellinger correctly charged on this point. He read to the jury the provisions of Section 907, which are as follows: "Upon view of a felony committed, or upon certain information that a felony has been committed, or upon view of a larceny committed, any person may arrest the felon or thief, and take him to a Judge or magistrate, to be dealt with according to law."

Judge Bellinger carefully explained to the jury the meaning of this section, although, as indicated, the answer did not plead or even suggest justification, or that the defendants were acting under, or by virtue of, Section 907.

The specific error which the defendants complain of is that the trial Judge instructed the jury that while "any person" may arrest a felon under the circumstances stated, it is for the purpose of taking the alleged felon before a Judge or magistrate "to be dealt with according to law," and Judge Bellinger says further: "I charge you further that if a person who arrests a person, with no intention of taking him to a Magistrate or Judge, it makes no difference if the arresting party was or was not acting upon information that felony had been committed, for a private person can only arrest for the purpose of taking the arrested party to a Magistrate or

Judge, for the purpose of having him dealt with according to law."

We think the law was aptly and rightly stated by the learned trial Judge. The suggestion that the word "may" used in the statute not only relates to the arrest, but also to the matter of taking the felon before a Judge or magistrate, is obviously untenable; for while a private person may arrest, when he does so, the duty of taking the person so arrested before the magistrate automatically and imperatively follows. The obvious purpose of the statute is to permit such an arrest so as to prevent the possible escape of a felon. And where there is ample opportunity to procure a warrant for the arrest in the usual manner, the failure so to do might well be significant in determining the reasonableness of the conduct of the person making the arrest. Am. Law Inst. Restatement, Torts, Section 119. But without regard to that, it would be subversive of the liberty of a citizen, for which the law is said to be very jealous, if a private person might arrest and then at his option take the law in his own hands and conduct an inquisition to determine whether he should release his prisoner or deliver him to the constituted official authorities. The following statement of the law, as contained in 6 C. J. S., Arrest, page 619, § 17, is well supported by reason and authority: "A private person who makes an arrest may hold his prisoner in custody only for a reasonable time. He must, without unreasonable delay, either take him before a magistrate, turn him over to an officer, or place him in jail. If he fails to do so, he cannot justify the arrest."

What has been said above applies with equal force to the point made by appellants in their Exception 18, that a new trial should have been granted on the ground that the arrest of respondent was lawful. This issue was submitted to the jury under a charge as favorable to the defendants as would have been warranted under any reasonable construction of the evidence.

In this connection we observe that Exception 22 charges that the Court erred in refusing to grant the motion for a new trial on the ground that the testimony showed that the plaintiff himself consented to be released after arrest without being brought before the Court, and that such consent constitutes a special defense in this case. We are unable to find this alleged ground in the motion for a new trial as set forth in the Transcript of Record. But even if it may be construed to be included in the grounds there stated, we think it clearly has no support in the evidence.

(3) The next question for our consideration is: Did the trial Judge err in charging that if the plaintiff failed to prove a conspiracy he could recover against one or more of the defendants if such defendant or defendants had falsely imprisoned the plaintiff without a conspiracy?

The charge, however, was in precise accordance with the pleadings and does not appear to us to have been in any respect erroneous. Indeed, counsel for the appellants say that since the verdict was against all of the defendants the jury must have come to the conclusion that there was a conspiracy, while there was no evidence of such; but as we have already stated, and as was held on the former appeal, the testimony afforded a reasonable inference that the defendants were acting in concert.

(4) Did the trial Judge err in his charge as to the measure of damages?

The complaint alleges (Paragraph 2) that the plaintiff was "prevented from attending the picture show or to join in any other playful matters" for the period of time involved, which was approximately an hour and a half. But later in the complaint it is alleged that by reason of the imprisonment and the restraint of his liberty the plaintiff was damaged in the sum of $5,000.00. The contention of the defendants appears to be that the plaintiff would be confined to damages resulting from being deprived of attending the picture show or joining in any other playful matters for that

period of time, and that Judge Bellinger erred in stating that he might recover for humiliation, indignity and mental suffering, etc., his charge on this subject being as follows: "The measure of damages, in a case of this character, would be for any damages that would naturally flow as a direct and proximate result of his being deprived of his liberty, if you find that he was, such as humiliation, indignity, and mental suffering that he has been put to, or any deprivation of his rights that he may have been deprived of as a result of losing his liberty, if he did lose his liberty—if you find from the evidence that he did lose his liberty through the acts of these parties, against his will. I believe that is about all it covers."

The law is well settled that general damages need not be specially pleaded, and there can be no doubt that humiliation, indignity and mental suffering naturally and proximately would result from a false imprisonment. General damages are not required to be pleaded because the law imputes knowledge thereof to the defendants. Special damages, however, are required to be pleaded, so that the defendants may have notice thereof with opportunity to defend. The law on this subject has been recently clearly and definitely stated in the opinion of this Court in the case of *Hobbs v. Carolina Coca-Cola Bottling Company,* delivered by Mr. Justice Fishburne, and filed on the 9th day of July, 1940.

The rule is also accurately expressed in the following quotation from 15 Am. Jur., 745: "It is an established rule of pleading that general damages as distinguished from special damages, that is, such as naturally, logically, and necessarily result from the injury complained of, or those which the law will imply from the facts set forth, need not be specially pleaded."

(5) Did the trial Judge err in refusing defendants' motion for a new trial on the ground that the verdict was a quotient one?

After the verdict was rendered there were discovered in the jury room twelve slips of paper on which varying amounts "from $5,000.00 down to $500.00" were written; and there was also found, lying on the table in the room, another slip of paper with an addition of these figures, showing a total of $37,000.00, "which said $37,000.00 was divided by twelve and the division thereof amounting to over $3,-000.00." Hence it is sought to be inferred that the jury rendered a quotient verdict in violation of law.

But Judge Bellinger held that the burden of proving that the verdict was a quotient one was on the defendants, and that they had failed to carry this burden. In his order overruling the motion for a new trial he cites the case of *Wannamaker v. Traywick,* 136 S. C., 21, 134 S. E., 234, where the Court reached a like conclusion, although the facts in that case tending to show a quotient verdict were perhaps stronger than in the case at bar. The opinion there was delivered by Mr. Justice Blease (afterwards Chief Justice), and is a sound and interesting one.

A quotient verdict is rightly condemned, because it does not in truth and in fact represent the findings of the jury, but is really the result of chance, for it is based upon a prior agreement that the jury will be bound by the fortuitous quotient resulting from the amounts listed by each of the jurors. It will be observed that the vice or impropriety of the arrangement arises, as was held in the *Wannamaker case,* "not in the method nor the sum of the result, but in the prior agreement to be bound by it."

In the case at bar the slips do indicate clearly that all of the jurors were in favor of awarding damages to the plaintiff, and hence it was essential for each juror to name the amount he had in mind so that upon the figures so given, after due discussion and deliberation, a correct verdict might be arrived at as representing the consensus of opinion. It appears here that three of the jurors suggested $3,000.00, five others a larger amount, two $2,500.00, and that only

two jurors named the smaller amount of $500.00. In view of these opinions of the individual jurors it is not at all surprising that they finally agreed upon the sum of $3,000.00. It is possible, although of course this is only by way of inference, that one of the jurors might of his own accord in the course of the discussion have ascertained the average sum and proposed the result as the amount of the verdict, and that this was assented to. But even if there were evidence that this was done, this would not have vitiated the verdict under the holdings of the *Wannamaker case*.

It is also equally possible by way of inference that after the verdict was agreed upon someone tested it to see how near a mathematical average it was. It was in fact somewhat less than the quotient, although this standing alone would not be conclusive.

The appellants, however, attach particular importance to the fact that one of the slips was for $500.00 "& costs," and the verdict actually contained the addition of the words "and costs." We are unable, however, to find any peculiar significance in this circumstance, for it indicates only that at least one of the jurors was under the impression that the verdict should provide for costs, so that no part of the costs would fall upon plaintiff; while of course reference to costs in the verdict has no legal effect and is mere surplusage.

We adhere to the ruling in the quite recent case of *Bunton v. State Highway Department*, 186 S. C., 463, 196 S. E., 188, 194, that a quotient verdict is illegal and should not be allowed to stand "where it is clearly shown that the verdict rendered is such a one." But we think Judge Bellinger was correct in holding that the evidence was insufficient to establish that this verdict was in fact a quotient one.

(6) The last question for consideration raised by the appeal is: Did the Court err in refusing the motion for a new trial on the ground that the verdict was grossly excessive, the result of passion, prejudice and caprice?

We think the following language contained in the ██ opinion in the case of *Currie v. Davis, Agent,* 130 S. C., 408, 126 S. E., 119, 123, is quite applicable here: "The assessment of unliquidated damages for an injury of this character cannot proceed by rule and must rest in the sound discretion of the jury, controlled by the discretionary power of the Circuit Judge, in the tribunal appointed by law to try the facts. There is no market value for injured feelings. The value of money in comparison with the value of the normally self-satisfied state of mind of which a man may be deprived by a wrongful invasion of his rights, a trampling upon the sensitive tentacles of his personal dignity, a public aspersion upon his manhood, or by abusive treatment of any character, is a matter as to which reasonable men may, and do, differ widely. The verdict was approved by the Circuit Judge as an award of compensatory damages. His conclusion cannot be held erroneous as a matter of law."

Furthermore, after a careful review of the entire record in the case at bar, we are in full accord with the following statement from the order of Judge Bellinger refusing a new trial: "It is true that human liberty is difficult of admeasurement in dollars and cents, but this difficulty is brought about by reason of its great value, and I cannot say that Three Thousand ($3,000.00) Dollars is excessive under the facts here, especially so, when I must consider the shame and humiliation that the plaintiff, a child of tender years, underwent while being accused of having broken into a residence and stealing money therefrom and as a result thereof being unlawfully restrained of his liberty by the defendants."

Our conclusion is that all of the issues raised by the appellants should be determined in favor of the respondent, and that the exceptions, all of which have been carefully considered by us, should be overruled.

The judgment of the Circuit Court is affirmed.

118

MR. CHIEF JUSTICE BONHAM and MESSRS. JUSTICES BAKER, FISHBURNE and STUKES concur.