## UNITED STATES of America

v.

## ALLEGHENY BOTTLING COMPANY, Morton M. Lapides, James J. Harford and Odis R. Allen, Defendants.

### Crim. No. 87–123–N.

United States District Court, E.D. Virginia, Norfolk Division.

Decided Sept. 9, 1988.

Nunc Pro Tunc Aug. 30, 1988.

Kenneth E. Newman, Donovan, Leisure, Newton & Irvine, New York City, Conrad M. Shumadine, Willcox & Savage, Norfolk, Va., for James H. Harford.

Robert H. Morse, Galland, Kharasch, Morse & Garfinkle, Washington, D.C., Wayne Lustig, Guy, Cromwell, Betz & Lustig, Virginia Beach, Va., for Morton M. Lapides.

James Walsh, McGuire, Woods, Battle & Boothe, Richmond, Va., Jerrold Weinberg, Weinberg & Stein, Norfolk, Va., for Allegheny Bottling Co.

David C. Jordan, D. Bruce Pearson, and Terrence McDonald, Antitrust Div., U.S. Dept. of Justice, Washington, D.C., for U.S.

## SENTENCING OPINION

DOUMAR, District Judge.

On May 19, 1988, Allegheny Bottling Company (Allegheny Pepsi), Morton M. Lapides, and James J. Harford were found guilty of price-fixing, after a seven-week

trial, in violation of section 1 of the Sherman Act, 15 U.S.C. § 1. Odis R. Allen pled guilty on March 22, 1988. This opinion is limited to setting forth the reasons for the sentence and the terms of probation imposed upon Allegheny Pepsi.

## I. BACKGROUND

This case arises from a conspiracy between Mid–Atlantic Coca–Cola Bottling Company (Mid–Atlantic Coke) and defendant Allegheny Bottling Company, formerly Allegheny Pepsi–Cola Bottling Company. The conspiracy began with Allegheny Pepsi, initially through its chairman of the board, with its president and its executive vice president. Allegheny Pepsi was the wholly owned subsidiary of Allegheny Beverage and Allegheny Beverage was a publicly held corporation with two classes of stock. All of the preferred shares were owned by the defendant Morton M. Lapides, and this ownership interest entitled Mr. Lapides to select five of the nine members of the board of directors. Although the remaining shares were publicly traded and owned, Lapides was still the principal stockholder and no director had ever been elected over his objection. He is a hands-on operator who controlled the company, as his counsel expressed, like a "tyrant".

Allegheny Pepsi was found guilty by a jury of a price-fixing conspiracy which occurred in the Norfolk, Richmond and Baltimore areas. Morton M. Lapides, the chairman of the board of Allegheny Pepsi, was found guilty by a jury. James Sheridan, the president of Allegheny Pepsi, had previously pled guilty, and Armand Gravely, a Richmond area manager, previously had been found guilty by a jury. Stanley Fabian, Norfolk area manager of Allegheny Pepsi, as well as Jerry Pollino, the executive vice president and division manager of the Baltimore division of Allegheny, were granted immunity. Edward L. Wynns, a vice president of Mid–Atlantic Coke, had pled guilty to false declarations before a grand jury. Allegheny Pepsi was so permeated with the conspiracy that the lower ranking employees of the company were completely aware of the well known fact that there was a price-fixing agreement between the Pepsi and Coke distributors.

Mid–Atlantic Coca–Cola Bottling Company (Mid–Atlantic Coke) pled guilty to price-fixing in two jurisdictions and has been fined $1,000,000 in each of the jurisdictions under a plea bargain agreement. Defendant James J. Harford was the president of Mid–Atlantic Coke. Odis R. Allen, a vice president of Mid–Atlantic Coke and one time in charge of the areas encompassing both Richmond, Virginia and Norfolk, Virginia, pled guilty before the trial began. "Bud" Coe, the division manager in charge of the Baltimore area of Mid–Atlantic, was granted immunity in order to testify.

The pre-conspiracy period was characterized by intense competition between Coke and Pepsi, and by frequent "deep discounting", i.e., discounting below the prices offered by the companies in periodic letters mailed by each of the companies to its customers and known as promotional letters. The conspiracy began in 1982 and involved an agreement to adhere to the prices established in promotional letters published by Mid–Atlantic Coke and Allegheny Pepsi. The agreement contemplated adherence to these published prices for a wide range of Coke and Pepsi products. The agreement was carried out in the markets of Norfolk and Richmond, Virginia and Baltimore, Maryland. In this way, the companies ended a period of intense competition, stabilized the market, and maintained higher prices for their cola products.

It is difficult, if not impossible, to identify with particularity the specific persons who paid higher prices because of the conspiracy. It may have been the retailer, the consumer, or both, but it is a problem of impossible magnitude to determine exactly what victim suffered what amount of damages. The only conclusion which could reliably be drawn is that the public was a victim. No exact figure can be developed for the non-fixed market price for Coke and Pepsi products, since they so dominated this oligopolistic market. It does appear from the evidence, however, that the profit gained by the defendant companies through price-fixing over the previously es-

tablished competitive prices is far in excess of the $1,000,000 fine provided by the Sherman Act for punishment of such conspiracies. Through the agreement, the companies received what appears to be an increase in revenue of between ten and twelve million dollars as shown in the presentence reports.

Utilizing the trial evidence rather than the presentence report merely emphasizes this. For example, in the Baltimore market, Coke sold 6,200,000 to 7,000,000 cases of soft drinks per year. Tr. at 1481. Of this amount, the "take-home" or general retail market comprised 80%, or approximately 4,960,000 cases. Of these, 70% or approximately 3,472,000 cases, were sixteen ounce nonreturnable bottles. Tr. at 1486. Prior to the price-fixing conspiracy, the promotional price of sixteen ounce nonreturnable cases sold by both companies fluctuated between $6.00 and $6.40 a case. In November of 1982, both companies set the price at $6.80 and held it there for over a year until December 31, 1983. This elevated price probably caused the companies to earn somewhere around an additional forty cents per case to a maximum of eighty cents per case over the pre-conspiracy price for the year 1983.

Thus, over one million dollars in illegal revenues were obtained just from the sale of sixteen ounce nonreturnable bottles in the Baltimore area market by Mid–Atlantic Coke in the year 1983. The price in the Baltimore area was fixed in 1984 at $7.20 per case which is an increase of between eighty cents and one dollar twenty cents per case over the pre-conspiracy price. Calculating the market price is difficult at this point because of the time for which the conspiracy had been operating and because of the market domination of Coke and Pepsi. Compared to the pre-conspiracy prices, Mid–Atlantic Coke recovered more than two million dollars (and perhaps closer to four million dollars) extra for the year 1984. Obviously, if we go into Allegheny Pepsi, you can see how easy it is to double these figures for the two companies.

When one analyzes it in this fashion, it is easy to understand how the government contends that the ten to twelve million dollar figure shown in the presentence report is indeed conservative and the Court so finds it is conservative. Since a particular identifiable victim cannot be shown to have suffered a specific amount of damages, however, restitution may not be ordered under the law as it existed at the time of the commission of this offense. *See United States v. Wright Contracting Co.*, 728 F.2d 648 (4th Cir.1984).

The Lord Chancellor of England said some two hundred years ago, "Did you ever expect a corporation to have a conscience, when it has no soul to be damned, and no body to be kicked?"[1] Two hundred years have passed since the Lord Chancellor espoused this view, and the whole era of what is and is not permitted or what is or is not prohibited, has changed both in design and in application. Certainly, this Court does not expect a corporation to have a conscience, but it does expect it to be ethical and abide by the law. This Court will deal with this company no less severely than it will deal with any individual who similarly disregards the law.

## II. SENTENCE IMPOSED

For the reasons stated, Allegheny Bottling Company is sentenced to three (3) years imprisonment and a fine of One Million Dollars ($1,000,000.00). Execution of the sentence of imprisonment is suspended and all but $950,000.00 of said fine is suspended, and the defendant is placed on probation for a period of three (3) years.

As special conditions of the probation, in addition to the normal terms of probation, the defendant, Allegheny Bottling Company shall provide:

(a) An officer or employee of Allegheny of comparable salary and stature to Jerry Pollino, Allegheny Pepsi–Cola Bottling company's (Allegheny Pepsi's) former Vice President of Sales, to perform forty (40)

1. Coffee, *"No Soul to Damn: No Body to Kick": An Unscandalized Inquiry Into the Problem of Corporate Punishment,* 79 Mich.L.Rev. 386, 386 (1980) (quoting Edward, First Baron Thurlow 1731–1806).

hours of community service per week in the Baltimore, Maryland area for a two (2) year period without compensation to the defendant.

(b) An officer or employee of Allegheny of comparable salary and stature to Armand Gravely, Allegheny Pepsi's former Richmond Division Vice President and Manager, to perform forty (40) hours of community service per week for a one (1) year period without compensation to the defendant in the Richmond, Virginia area.

(c) An officer or employee of Allegheny of comparable salary and stature to Stanley Fabian, Allegheny Pepsi's former Vice President and Norfolk Division Manager, to perform forty (40) hours of community service per week in the Norfolk, Virginia area for a one (1) year period without compensation to the defendant.

(d) An officer or employee of Allegheny of comparable salary and stature to James Sheridan, Allegheny Pepsi's former President, to perform forty (40) hours of community service per week for a two (2) year period without compensation to the defendant in the areas of Maryland and Virginia formerly served by the Richmond, Norfolk and Baltimore Divisions of Allegheny Pepsi.

It is the further condition of such probation that the company shall not dispose of any of its franchises, capital assets or plants or facilities in the Norfolk, Richmond or Baltimore areas, without specific permission of this Court through the probation officer.

That portion of the fine that is not suspended ($950,000.00) shall be paid within 10 days from the date hereof. All of the community service shall be performed under the direction of the probation office and subject to the approval of the Court. In no event is Allegheny Bottling Company to receive any form of compensation for the community service performed.

## III. DISCUSSION

This case was brought pursuant to the Sherman Act, which provides in part:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by a fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars, *or by imprisonment not exceeding three years,* or by both said punishments in the discretion of the court.

15 U.S.C. § 1 (emphasis added). A crucial issue in this case is whether the imprisonment term in this statute applies to corporations. Before the Court addresses that issue, however, another issue will be disposed of—the lingering idea that a corporation cannot be imprisoned. This Court today specifically holds that a corporation can be "imprisoned" under the Sherman Act, contrary to the traditional view.

This Court recognizes that this is a novel holding, and that it appears to run contrary to some authority. Therefore, this opinion will set forth the reasons why the sentence imposed in this case is appropriate. The discussion will focus on two central issues. First, can a corporation, generally speaking, be "imprisoned"? The Court answers this question in the affirmative. Second, does statutory construction yield the conclusion that the Sherman Act provides for the imprisonment of convicted corporations in general and Allegheny Bottling Company in particular? The Court also answers this question in the affirmative.

### 1. Corporate Imprisonment

The term "imprisonment" is defined by Webster to include "constraint of a person either by force or by such other coercion as restrains him within limits against his will." *Webster's Third New International Dictionary* at 1137. It is similarly defined as "forcible restraint of a person against his will." *The Random House College Dictionary* at 669. The key to corporate

imprisonment is this: imprisonment simply means *restraint*.

That imprisonment simply means restraint can be seen clearly from the law of false imprisonment. " 'Imprisonment', although it seems originally to have meant stone walls and iron bars, no longer signifies incarceration...." W. Keeton, *Prosser and Keeton On Torts* 47 (5th Ed.1984) (footnotes omitted). Imprisonment, with respect to the tort of false imprisonment, now contemplates only some form of restraint. *See id.* Numerous cases illustrate this point.

In *Kress v. Musgrove*, 153 Va. 348, 149 S.E. 453 (1929), false imprisonment was said to be "the restraint of one's liberty ... by words or acts which [the imprisoned person] fears to disregard...." 149 S.E. at 454. "To constitute false imprisonment it is not essential that a citizen should be confined in a common jail or placed in the custody of an armed guard...." 149 S.E. at 455. In *Kress*, the Virginia Supreme Court found false imprisonment where one person merely forced another person to exit by way of a particular doorway. *See* 149 S.E. at 455.

In *Zayre of Virginia v. Gowdy*, 207 Va. 47, 147 S.E.2d 710 (1966), it was said:

> It is not essential that a citizen be confined in jail or placed in the custody of an officer. If a person is under a reasonable apprehension that force will be used unless he willingly submits, and he does submit to the extent that he is denied freedom of action, this, in legal contemplation, constitutes false imprisonment.

147 S.E.2d at 713. In *Zayre*, false imprisonment was found where persons "were deprived of their right of freedom of movement and the right to come and go as they chose." 147 S.E.2d at 714.

In *Johnson v. Norfolk and W. Ry.*, 82 W.Va. 692, 97 S.E. 189 (1918), it is said:

> In order to constitute a case of false imprisonment, it is essential that there should be some direct restraint of the person, but to constitute 'imprisonment' ... it is not necessary that there should be confinement in a jail or prison. Any exercise of force, or express or implied threat of force, by which in fact any person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.

97 S.E. at 191. Similarly, in *State ex rel. Sovine v. Stone*, 149 W.Va. 310, 140 S.E.2d 801 (1965), it was said, "false imprisonment may be effected without manual seizure or touching...." 140 S.E.2d at 804.

In *Hales v. McCrory–McLellan Corp.*, 260 N.C. 568, 133 S.E.2d 225 (1963), it is said regarding the imprisonment necessary for false imprisonment:

> Force is essential only in the sense of imposing restraint.... The essence of personal coercion is the effect ... on the will of the plaintiff.... False imprisonment may be committed by words alone, or by acts alone, or by both; it is not necessary that the individual be actually confined or assaulted, or even that he should be touched.... Any exercise of force, or express or implied threat of force, by which in fact the other person is deprived of his liberty, compelled to remain where he does not wish to remain, or to go where he does not wish to go, is an imprisonment.... The essential thing is the restraint of the person.

133 S.E.2d at 227 (citations omitted).

In *Westbrook v. Hutchison*, 195 S.C. 101, 10 S.E.2d 145 (1940), it was said:

> The use of force is not necessary to constitute false imprisonment. Any genuine restraint constitutes an actionable imprisonment although effected without contact with the person. The essential thing is the restraint of the person.... If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion are at hand, a person may be as effectively restrained and deprived of liberty, as by prison bars."

10 S.E.2d at 148.

■ The cases are replete with examples such as those above. *See, e.g., Mendoza v. K–Mart, Inc.*, 587 F.2d 1052, 1058 (10th Cir.1978); *Watkins v. Oaklawn Jockey Club*, 86 F.Supp. 1006, 1017 (W.D.Ark.

1949), *aff'd*, 183 F.2d 440 (8th Cir.1950). Such cases make clear that imprisonment does not mean incarceration in a jail. Imprisonment simply means *restraint*, that is, a deprivation of liberty. There is imprisonment when a person is under house arrest, for example, where a person has an electronic device which sends an alarm if the person leaves his own house.

Corporate imprisonment requires only that the Court restrain or immobilize the corporation. Such restraint of individuals is accomplished by, for example, placing them in the custody of the United States Marshal. Likewise, corporate imprisonment can be accomplished by simply placing the corporation in the custody of the United States Marshal. The United States Marshal would restrain the corporation by seizing the corporation's physical assets or part of the assets or restricting its actions or liberty in a particular manner. When this sentence was contemplated, the United States Marshal for the Eastern District of Virginia, Roger Ray, was contacted. When asked if he could imprison Allegheny Pepsi, he stated that he could. He stated that he restrained corporations regularly for bankruptcy court. He stated that he could close the physical plant itself and guard it. He further stated that he could allow employees to come and go and limit certain actions or sales if that is what the Court imposes.

Richard Lovelace said some three hundred years ago, "stone walls do not a prison make, nor iron bars a cage." It is certainly true that we erect our own walls or barriers that restrain ourselves. Any person may be imprisoned if capable of being restrained in some fashion or in some way, regardless of who imposes it. Who am I to say that imprisonment is impossible when the keeper indicates that it can physically be done? Obviously, one can restrain a corporation. If so, why should it be more privileged than an individual citizen? There is no reason, and accordingly, a corporation should not be more privileged.

Cases in the past have *assumed* that corporations cannot be imprisoned, without any cited authority for that proposition. *See, e.g., United States v. Union Supply*

*Co.*, 215 U.S. 50, 55, 30 S.Ct. 15, 16, 54 L.Ed. 87 (1909); *United States v. Interstate Cigar Co.*, 801 F.2d 555, 556 (1st Cir.1986). This Court, however, has been unable to find any case which actually held that corporate imprisonment is illegal, unconstitutional or impossible. Considerable confusion regarding the ability of courts to order a corporation imprisoned has been caused by courts mistakenly thinking that imprisonment necessarily involves incarceration in jail. *See, e.g., Melrose Distillers, Inc. v. United States*, 359 U.S. 271, 274, 79 S.Ct. 763, 766, 3 L.Ed. 800 (1959). But since imprisonment of a corporation does not necessarily involve incarceration, there is no reason to continue the assumption, which has lingered in the legal system unexamined and without support, that a corporation cannot be imprisoned. Since the Marshal can restrain the corporation's liberty and has done so in bankruptcy cases, there is no reason that he cannot do so in this case as he himself has so stated prior to the imposition of this sentence.

## 2. *Statutory Construction*

■ The issue remaining before the Court is whether the specific provisions of the Sherman Act relevant to this case provides for imprisonment of Allegheny Bottling Company. The holding of this Court is that Allegheny Bottling Company should be imprisoned pursuant to the Sherman Act. That this is the correct interpretation of this statute can be seen by breaking the statute into clauses.

The relevant provision of the Sherman Act provides:

Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal. Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony, and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars, or by im-

prisonment not exceeding three years, or by both said punishments, in the discretion of the court.

15 U.S.C. § 1.

The first clause involves the illegality of conduct such as price-fixing, and is clear:

(A) Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal.

The second clause makes prohibited conduct a felony, and is also clear:

(B) Every person who shall make any contract or engage in any combination or conspiracy hereby declared to be illegal shall be deemed guilty of a felony.

The third clause provides for punishment of the felonious conduct, i.e., sentencing. It is the construction of this provision which is at issue here. It states:

(C) and, on conviction thereof, shall be punished by fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars, or by imprisonment not exceeding three years, or by both said punishments, in the discretion of the court.

This latter clause is broken down as follows:

(C) and, on conviction thereof, shall be punished by

(1) fine not exceeding one million dollars if a corporation, or if any other person, one hundred thousand dollars,

(2) or by imprisonment not exceeding three years,

(3) or by both said punishments,

(4) in the discretion of the court.

This construction views the sentencing provisions as having four clauses. The first clause authorizes a fine, the amount of which depends upon whether the offender is a corporation (fine of one million dollars) or "any other person" (fine of one hundred thousand dollars). The second clause authorizes "imprisonment" of the offender. The third clause authorizes the imposition of both the punishment described in the first clause and the punishment described in the second clause. The fourth clause

authorizes the judge to exercise his discretion as to which of the first three clauses to apply to a particular offender.

In interpreting a statute, the primary concern of the Court is to discern the congressional intent as to the statute's meaning. *See Raven v. Panama Canal Co.,* 583 F.2d 169, 171 (5th Cir.1978), *cert. denied,* 440 U.S. 980, 99 S.Ct. 1787, 60 L.Ed.2d 240 (1979); 82 C.J.S. *Statutes,* § 321. The Court must look to the entire Act and, if possible, give every part of the statute effect. *Weinberger v. Hynson, Westcott & Dunning, Inc.,* 412 U.S. 609, 633, 93 S.Ct. 2469, 2485, 37 L.Ed.2d 207 (1973).

Congress could have clearly limited the imprisonment provisions of the Sherman Act to natural persons, as it did for example in the Refuse Act, 33 U.S.C. § 411. Congress, however, did not so limit the Sherman Act. The absence of such provisions in the Sherman Act implies congressional unwillingness to have the Sherman Act so limited.

Other statutes lead to a similar conclusion. The Comprehensive Crime Control Act, 18 U.S.C. § 3621 (repealed), provided for "imprisonment of convicted persons." The statute made no distinction between corporations and individuals. In 1984 that statute was repealed, and Congress enacted the Sentence Reform Act of 1984, 18 U.S.C. § 3551 *et seq..* Section 3551 of the S.R.A. authorizes different sentences for individuals, § 3551(b), and for corporations, § 3551(c). Imprisonment is authorized for individuals but not for corporations. This is further evidence of congressional understanding of the corporate imprisonment issue. This also supports the view of this Court that Congress would have similarly changed the Sherman Act had Congress intended for corporations to be immune from imprisonment.

The preceding proposition is especially compelling in view of recent amendments to the Sherman Act. Prior to 1974, the punishment provisions of the Sherman Act made no distinction between corporations and individuals. When the Act was amended in 1974 Congress increased the fines and

distinguished fines between corporations and individuals, substituting in place of the words "fifty thousand dollars" the words "one million dollars if a corporation or, if any other person, one hundred thousand dollars." [2] The imprisonment provisions, however, still applied to "every person." This is weighty evidence that Congress intended no such distinction to be made in imprisonment. This Court will not impose limitations in a statute which Congress chose not to impose.

The premise that a corporation could not be imprisoned is an assumption made by judges, and not by Congress. The judge-made assumption was made after the passage of the Act. At a minimum the courts should allow Congress to imprison a corporation if Congress so chooses. No justification can be presented by the courts to do otherwise. This Court today rejects the judge-made assumption that a corporation cannot be imprisoned, because this Court must follow the will of Congress in interpreting lawful statutes and must not without justification frustrate or prevent the exercise of that will.

It is a proposition beyond refute that statutes should be given a construction which gives effect to their purpose rather than defeat it. *See* 32 C.J.S. *Statutes* § 323, and voluminous cases cited therein in footnotes. In the words of Corpus Juris Secundum,

> In construing a statute, the court must look to the object to be accomplished, the evils and mischief sought to be remedied, or the purpose to be subserved, and place on it a reasonable or liberal construction which will best effect its purpose rather than one which will defeat it.

*Id.* It is also clear that statutes like the Sherman Act should be construed liberally to achieve their purpose. *See McNally v. United States*, —— U.S. ——, 107 S.Ct. 2875, 2888, 97 L.Ed.2d 292 (1987) (Stevens, dissenting); *cf. McElroy v. United States*, 455 U.S. 642, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982); *Offuct Housing Co. v. Sorpy County*, 351 U.S. 253, 76 S.Ct. 814, 100 L.Ed. 1151 (1956). The Sherman Act is a broadly phrased remedial statute, the purpose of which is to protect the public, *e.g., D.R. Wilder Mfg. Co. v. Corn Products Refining Co.*, 236 U.S. 165, 35 S.Ct. 398, 59 L.Ed. 520 (1915), and to promote free competition, *see, e.g., United States v. Union Pac. R.R.*, 226 U.S. 61, 33 S.Ct. 53, 57 L.Ed. 124 (1912). None of these purposes are promoted effetively by permitting corporate felons to merely pay a fine out of illegally obtained profits.

Corporate imprisonment not only promotes the purposes of the Sherman Act, but also promotes the purposes of sentencing. The purposes of sentencing, according to the United States Sentencing Commission, include incapacitating the offender, deterring crime, rehabilitating the offender, and providing just punishment. *United States Sentencing Comm. Guideline Manual* 1.1 (Oct. 1987). The corporate imprisonment imposed today is specifically tailored to meet each of these purposes.

Incapacitation or restraint of the liberty of Allegheny is certainly accomplished by corporate imprisonment. No more price-fixing by Allegheny Pepsi will occur when the United States Marshal prevents the corporation from acting.

Deterrence of price-fixing will also be achieved by corporate imprisonment of Allegheny Pepsi. Other corporations will be deterred by seeing that violation of the Sherman Act could lead to consequences sufficiently severe as to dictate that the potential cost of price-fixing is seldom worth the potential gain.

The deterrence achieved by corporate imprisonment may in fact be the only effective deterrent to price-fixing, especially regarding corporations as large as the ones in this case. A corporation the size of Allegheny Pepsi will, through price-fixing, make many times the maximum fine by the time the price-fixing is detected. Knowing this, the fine will be ineffective as a deterrent even if the probability of detection is considered great. The fine becomes simply a cost of doing business, which is small in

**2.** Antitrust Procedures and Penalties Act, 88 Stat. 1706 (1974).

comparison with the potential profits. Corporate imprisonment, in contrast, prevents the cost-benefit analysis to economically justify price-fixing. The corporate decision-makers would know that, if caught, the corporation would lose more than they could gain.

## IV. CONCLUSION

For the reasons discussed herein, the Court has ORDERED the sentence as shown in the judgment and commitment order.

The Clerk is DIRECTED to send copies of this opinion to all counsel of record.

IT IS SO ORDERED.