UNITED STATES of America, Plaintiff,

v.

ALLEGHENY BOTTLING COMPANY, James J. Harford, MORTON M. Lapides, and Odis R. Allen, Defendants.

ALLECO, INC., Plaintiff,

v.

UNITED STATES of America, Defendant.

Cr. No. 87–123–N, Civ. A. No. 92–1274–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

May 31, 1994.

Dale A. Cooter, Kenneth M. Robinson and Donna S. Mangold, Washington, DC, for Allegheny Bottling and Alleco.

David A. Blotner, Dorothy E. Hansberry and Joelle Anne Moreno, U.S. Dept. of Justice, Antitrust Div., Washington, DC, for the government.

### ORDER

DOUMAR, District Judge.

This matter is before the Court on motion of Alleco, Inc.,[1] on behalf of Allegheny Bottling Company, formerly Allegheny Pepsi–Cola Bottling Company ("Allegheny Pepsi"), for a writ of coram nobis pursuant to 28 U.S.C. § 1651. For the reasons discussed below, the Court DENIES this motion.

### I. Procedural and Factual History

#### A. Procedural History

In May 1988, after a seven week jury trial, Allegheny Bottling Company and its Chairman, Morton Lapides, as well as James J. Harford, President of Mid Atlantic Coca–Cola, were all found guilty of conspiring to fix prices in violation of the Sherman Antitrust Act. 15 U.S.C. § 1.[2] Allegheny Bot-

tling Company was sentenced to pay a fine of $1,000,000. The defendants appealed their convictions to the Fourth Circuit. On January 11, 1989, the Fourth Circuit affirmed the convictions by unpublished opinion. The Supreme Court denied certiorari on October 2, 1989.

On August 29, 1988, this Court sentenced the defendants. A $1,000,000 criminal fine was imposed on Allegheny Beverage Company. This fine was paid. Apparently, all of Allegheny Bottling Company's attorneys fees as well as the fine were either reimbursed by or paid directly by Alleco, the former parent company of Allegheny Bottling Company, pursuant to an indemnity agreement between Alleco and Pepsico. This agreement is described more fully below. Alleco now brings this action for a writ of coram nobis under the All Writs Act. 28 U.S.C. § 1651.

On January 15, 1992, at the same time as this motion was filed, both Alleco and Lapides also filed a motion for the undersigned district judge to recuse himself. On January 25, 1992, defendants filed a motion for leave to take limited discovery.

The Court arranged to hear and resolve the motion for recusal first and then to proceed to the motions for additional discovery and the underlying substantive motion. The Court first received briefs and heard oral argument on the motion to recuse. By order of May 22, 1992, the motion for recusal was denied.

The Court then received briefs and heard oral argument on the motion for additional discovery. During oral argument on this motion, in December 1992, this Court requested a classified report from the Department of Justice Office of Professional Responsibility regarding the actions of government attorneys involved with this case.[3] After reviewing this report and the other materials submitted, this Court denied defendants' motion for additional discovery by or-

---

1. Alleco, Inc., is the corporate successor to a former parent company of Allegheny Pepsi. For the details regarding the corporations in this transaction, please see below, Section I.B.1.

2. Defendant Odis Allen pleaded guilty prior to trial.

3. Morton Lapides' complaints were made to and investigated by the Justice Department's Office of Professional Responsibility. This Office conducted a full investigation of all the allegations.

der dated July 20, 1993. Also on December 16, 1992 this Court ordered that the cases of the corporate defendant and the individual defendant be severed. With these preliminary matters resolved, the substantive motion for a writ of coram nobis by the corporation is now before the Court. This order is solely concerned with the corporate defendant's motion. Lapides' motion will be considered in his action which is separate from this action.

## B. Factual History

### 1. The Corporate Entities

Allegheny Bottling Company, which had previously conducted business under the name Allegheny Pepsi–Cola Bottling Co.,[4] was the exclusive distributor of Pepsi–Cola products in the Baltimore, Richmond, and Norfolk marketing areas. At the time of this criminal conspiracy, that is, from 1982 until the beginning of 1985, Allegheny Bottling Company was a subsidiary of the Allegheny Beverage Corporation (now called "Alleco").

At that time, the parent corporation, Allegheny Beverage Corporation, was owned mostly by Morton Lapides. Lapides owned all of the "Series A" stock, allowing him to select four of the nine board members. He also owned the greatest portion of the common stock, allowing him considerable influence in the selection of the remaining five board members.

In May of 1985, Allegheny Beverage Corporation sold all of the capital stock of Allegheny Bottling Company, which had the exclusive distributorship in the above-mentioned areas, to Pepsico, Inc. for approximately $160 million. As part of this sale, Allegheny Beverage Corporation agreed to indemnify Pepsico against losses, including criminal fines resulting from the then-impending grand jury investigation which eventually led to this case. This indemnification agreement also provided that the Allegheny Beverage Corporation, and not Pepsico, would control the defense of the criminal case. At trial, it did appear to the Court that Alleco, and more specifically, Morton Lapides, controlled the defense of its former subsidiary, Allegheny Pepsi.

The Court is not aware of any significant change in the ownership of the stock of Allegheny Beverage Corporation since the time of this trial. However, as of 1988 all of Allegheny Beverage Corporation's operating subsidiaries had been sold off. Also, at some point during this period, Allegheny Beverage Corporation changed its corporate name to Alleco, Inc.

Throughout the rest of this order, the various corporate parties will be referred to as follows: The defendant, Allegheny Bottling Company (formerly the Allegheny Pepsi–Cola Bottling Company), will be referred to as Allegheny Pepsi. The original parent company, Allegheny Beverage Corporation, will be referred to by its new name, Alleco. The national corporation, which manufactures Pepsi and now owns Allegheny Pepsi, will be referred to by its corporate name, Pepsico.

### 2. The Prosecutions Resulting from the Price–Fixing Investigation

In the course of the prosecution of this price-fixing conspiracy, almost all of the officers of Allegheny Pepsi were either found guilty of price-fixing by a jury, pled guilty to the charges of price-fixing, or testified under grants of immunity to their knowledge of the price-fixing practices. Armand Gravely, vice president of Allegheny Pepsi and manager of the Richmond, Virginia area was found guilty by a jury on February 12, 1987.[5] Under grants of use immunity, Stanley Fabian and Jerry Pollino testified that both Allegheny Pepsi and Mid–Atlantic Coca–Cola were involved in price-fixing. At the time of the violations, Fabian was Norfolk area manager and vice president of Allegheny Pepsi; Polli-

---

4. Throughout the period of this conspiracy, the defendant corporation traded as Allegheny Pepsi–Cola Bottling Co. In July 1987, a few years after Pepsico, Inc. purchased the defendant from Lapides' Allegheny Beverage Corporation, Pepsico changed the defendant corporation's name to Allegheny Bottling Company.

5. His conviction was upheld by the Court of Appeals for the Fourth Circuit in *United States v. Gravely*, 840 F.2d 1156 (4th Cir.1988).

no was executive vice president as well as the manager of the Baltimore division of Allegheny Pepsi. James Sheridan, the president of Allegheny Pepsi, pled guilty to the price fixing on June 19, 1987. He admitted his own, as well as the corporation's involvement in the price-fixing scheme.

Several officers of Mid–Atlantic Coca–Cola also were implicated. On August 10, 1987, Edward Wynns pled guilty to making false statements to the grand jury in connection with this price-fixing investigation. Under a grant of use immunity, Bud Coe, a vice president of Mid–Atlantic Coca–Cola in the Baltimore office, gave testimony detailing the company's involvement in the scheme. On October 14, 1987, Mid–Atlantic Coca–Cola pled guilty to price fixing with Allegheny Pepsi and paid a $1,000,000 fine. The investigation into this matter also led to several guilty pleas on related matters by Mid–Atlantic Coca–Cola and its officers. Ultimately, Mid–Atlantic Coca–Cola paid nearly $3,000,000 in fines in this and other jurisdictions by virtue of criminal actions flowing out of this and related cases.

On October 14, 1987, the grand jury handed down an indictment against James J. Harford and Odis Allen, president and vice president of Mid–Atlantic Coca–Cola, against Morton Lapides, Chairman of the Board of Allegheny Pepsi, and against Allegheny Pepsi. Odis Allen pled guilty on March 22, 1988. After a seven-week trial, on May 19, 1988, the jury found Harford, Lapides, and Allegheny Pepsi guilty.

The underlying facts of this case as they relate to the form and nature of the price-fixing conspiracy are discussed more fully in previous opinions issued by this Court. *United States v. Allegheny Bottling Co.*, 695 F.Supp. 856 (E.D.Va.1988) [6]; *United States v. Allegheny Bottling Co.*, Criminal No. 87–123–N (E.D.Va. filed Sept. 19, 1988). In addition to the above-mentioned officers, the Court noted that "Allegheny Pepsi was so permeated with the conspiracy that the lower ranking employees of the company were completely aware of the well known fact that there was a price-fixing agreement between the Pepsi and Coke distributors." 695 F.Supp. at 857. In summary, the evidence against Allegheny Pepsi and its officers was overwhelming.

### 3. Allegations of Prosecutorial Misconduct

Alleco, the former parent company of the defendant corporation, now contends that Allegheny Pepsi's conviction resulted from violations of the Fifth and Sixth Amendments. Alleco adopts the position of Allegheny Pepsi's co-defendant, Morton Lapides, contending that investigators and prosecuting attorneys involved in the case had improper access to information about defendants' defense strategy that would have changed the result. In particular, they contend that Lawrence I. Weisman improperly communicated with various government officials, including the prosecutors at defendants' criminal trial. They assert that during this time Weisman was one of Lapides' attorneys and that any information garnered from him was obtained in violation of the attorney-client privilege and their related Fifth and Sixth Amendment rights.

Alleco's allegations rest almost entirely on the affidavit provided by Lawrence Weisman in settlement of defendants' civil lawsuit against him. *Alleco, Inc. & Lapides v. Weisman,* Civ. No. S–90–3216 (D.Md.1990). In exchange for this affidavit, Lapides released all claims against Weisman; these claims included potential damage claims of several million dollars and the release of a constructive trust that had been imposed on Alleco bonds owned by Weisman. In the body of the affidavit, Weisman provides a glimpse of the circumstances in which the affidavit was provided. In the final paragraph of the affidavit, he states:

> Most of the events described above occurred over 3 years ago during many serious illnesses and these are my best recollections as refreshed by recent information and documents made available and discovered by me and others.

6. *United States v. Allegheny Bottling Co.*, 695 F.Supp. 856, (E.D.Va.1988), *aff'd in part without opinion and rev'd in part without opinion*, 870 F.2d 655 (4th Cir.Va.1989), *and cert. denied, Lapides v. United States,* 493 U.S. 817, 110 S.Ct. 68, 107 L.Ed.2d 35 (1989).

Movants' Exhibit B, ¶ 10. Furthermore, several key points in Weisman's affidavit were contradicted by his own previous deposition testimony. A few weeks after giving this affidavit, Weisman died.

The circumstances surrounding the provision of the affidavit and the affidavits from the prosecutors denying the allegations therein raise serious doubts about the credibility of the Weisman affidavit and may indeed completely discredit it. However, this Court need not review the credibility issues at this time.

## II. Analysis

▮ The writ of error *coram nobis* is an extraordinary remedy, used only when the errors are of the most fundamental character, such as to render the underlying criminal proceeding irregular and invalid. *United States v. Morgan,* 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954). The original proceeding is presumed valid and the burden is on petitioner to demonstrate an error resulting in a complete miscarriage of justice. *United States v. Mandel,* 862 F.2d 1067, 1075 (4th Cir.1988), *cert. denied,* 491 U.S. 906, 109 S.Ct. 3190, 105 L.Ed.2d 699 (1989); *United States v. Scherer,* 673 F.2d 176, 178 (7th Cir.), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982). These strict standards for the granting of the writ are intended to preserve the benefits of finality, and therefore, the writ is limited to "defects that sap the proceedings of any validity." *United States v. Keane,* 852 F.2d 199, 203 (7th Cir.1988), *cert. denied,* 490 U.S. 1084, 109 S.Ct. 2109, 104 L.Ed.2d 670 (1989).

▮ The writ is available as an alternative to relief under 28 U.S.C. § 2255 when the defendant is no longer, or never was, "in custody" as required by that section. *Morgan,* 346 U.S. at 511, 74 S.Ct. at 252. The writ is also available to corporations. *United States v. Rad–O–Lite of Philadelphia, Inc.,* 612 F.2d 740, 744 (3d Cir.1979); *Polizzi v. United States,* 550 F.2d 1133, 1135 (9th Cir. 1976).

However, there are prudential limits on the availability of the writ. A series of cases in the Seventh Circuit demonstrates these limits. *Keane,* 852 F.2d 199; *United States v. Bush,* 888 F.2d 1145 (7th Cir.1989); *United States v. Kerner,* 895 F.2d 1159 (7th Cir. 1990); *United States v. Craig,* 907 F.2d 653, 657 (7th Cir.1990), *cert. denied, Craig v. United States,* 500 U.S. 917, 111 S.Ct. 2013, 114 L.Ed.2d 100 (1991). All of these cases resulted from a change in the law of mail fraud after the Supreme Court invalidated the intangible rights theory of mail fraud prosecution. *See McNally v. United States,* 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), *superseded by statute as stated in United States v. Stoneman,* 870 F.2d 102 (3d Cir.1989). *McNally* invalidated the indictments and jury instructions in all of these cases, yet the Seventh Circuit denied coram nobis relief because of prudential limits on the use of the writ. A district court summarized the teachings of several of these cases as follows:

> based on the historical purpose of the writ, the interests in finality of judgments, and the force to be given the custody requirement of Section 2255, coram nobis relief is only available to those petitioners who "'still suffer civil disabilities unique to criminal convictions.'" *Bush,* 888 F.2d at 1148 (citing *Keane,* 852 F.2d at 203).

*United States v. Gottlieb,* 738 F.Supp. 1174, 1178 (N.D.Ill.1990). In this case, the Court will assume for the purposes of argument that continuing civil disability is the $1,000,-000 fine.[7]

However, this line of authority also requires that the person suffering the disability must ask for the writ. Thus, in *Kerner,* the Seventh Circuit refused to allow the estate of

---

7. The decisions are not consistent on the question of whether a fine, in and of itself, is sufficient to constitute a continuing civil liability. For instance, the *Keane* court found that a fine is a "sunk cost rather than a continuing disability producing additional injury." 852 F.2d at 204. However, the Seventh Circuit also stated that the Fourth and Ninth Circuits "apparently do not require any showing of a disability before a writ of error coram nobis may issue." *Craig,* 907 F.2d at 658. The Seventh Circuit based this on its reading of *Mandel* which adopted the broad view that a felony conviction imposes a disabling "status" on a person. *Mandel,* 862 F.2d at 1075, n. 12.

the convicted person continue its pursuit of his motion for a writ, even though the estate would have received back the money paid in fines by Kerner. The *Kerner* court stated:

the narrow 'zone of interests' protected by the writ includes only the petitioner's right to be free of any lingering civil disabilities remaining from his arguably wrongful conviction. That interest is personal to Otto Kerner, Jr., and cannot survive his death. His estate is outside the 'zone of interests' sought to be protected by the writ and therefore lacks standing.

895 F.2d at 1163. A similar result was reached in *Craig,* 907 F.2d at 657, where the challenged conviction prevented the defendant's widow from receiving his pension benefits but the Seventh Circuit would not entertain her request for a writ of coram nobis.

In this case, the defendant corporation is not even a party. Instead, pursuant to an indemnification agreement, the former parent company is trying to step into the defendant corporation's shoes. Like Craig's widow or Kerner's estate, the former parent corporation would benefit from a favorable ruling. However, also like the widow and the estate, the former parent corporation is not within the narrow zone of interests protected by the extraordinary power of a writ of coram nobis.

A stockholder, in this case Alleco, which sells all of its stock to another person or entity, in this case Pepsico, but remains in contractual relationship with the new owner, has no standing to bring an action for a writ of coram nobis on behalf of a corporation in which it admittedly no longer has an interest. To rule otherwise would make such writs available to all the stockholders of any corporation found guilty of any crimes, or to any person who felt aggrieved by the conviction of a corporation. Otherwise, any party with a financial interest in a criminal trial, a bondsman for instance, would have standing to bring such a writ. This Court follows the Seventh Circuit's reasoning in *Craig* and *Kerner* in refusing to expand the availability of the writ in this manner. Although the law does appear to be ever-expanding, the ability to conclude litigation and trust in its finality must be preserved. This Court will not engage in such expansion of the use of this extraordinary writ.

Furthermore, even if this Court were to extend the writ to the former parent company, it would not grant such an extraordinary remedy on the facts of this case. Almost all of the corporate officers and many lower echelon employees provided information in one form or another of the corporation's culpability. The president, executive vice president, and other vice presidents admitted their own and the corporation's culpability. This conspiracy permeated the entire fabric of the corporation down to the lowest employee.

Any alleged flaws in the criminal prosecution of this matter would not save the corporation from an ultimate determination of its guilt, for the evidence against it—evidence from the mouths of its officers and employees—was overwhelming. It is difficult to fashion, even in fiction, any plausible scenario where the corporation itself would not have been found guilty. The only defense offered at trial seemed to be that there was no corporate resolution authorizing the price-fixing agreement executed and voted on at a directors' or stockholders' meeting. Indeed, under the facts of this case, it is inconceivable that any lawyer would have been able to fashion a viable defense for Allegheny Pepsi. Clearly, there was no miscarriage of justice in this case.

### III. Conclusion

For the foregoing reasons, this Court DENIES the motion of Alleco, Inc., the former owner of a majority of stock of Allegheny Pepsi, on behalf of Allegheny Pepsi for a writ of error coram nobis.

The Clerk of the Court is DIRECTED to forward copies of this order to counsel for the parties.

IT IS SO ORDERED.