**UNITED STATES of America,**
**Respondent–Appellee,**

v.

**Thomas E. KEANE,**
**Petitioner–Appellant.**

**No. 87–3030.**

United States Court of Appeals,
Seventh Circuit.

Argued June 3, 1988.

Decided July 5, 1988.

**200**

Jerome H. Torshen, Torshen, Schoenfield & Spreyer, Ltd., Chicago, Ill., for petitioner-appellant.

Helene B. Greenwald, Asst. U.S. Atty., Anton Valukas, U.S. Atty., Chicago, Ill., for respondent-appellee.

Before EASTERBROOK and MANION, Circuit Judges, and GORDON, Senior District Judge.[*]

EASTERBROOK, Circuit Judge.

Thomas E. Keane, once the Chairman of the Finance Committee of Chicago's City Council, was convicted of mail fraud. The indictment, using the "intangible rights" theory minted in *United States v. Isaacs,* 493 F.2d 1124, 1149 (7th Cir.1974), charged that Keane defrauded the people of Chicago out of their right to his honest services. Keane was convicted in October 1974 and served his sentence between April 1976 and February 1978. He was released from parole in February 1980. The Supreme Court of Illinois restored his license to practice law in 1984, *In re Keane,* 102 Ill.2d 397, 80 Ill.Dec. 756, 466 N.E.2d 208 (1984). In 1987, the year Keane turned 80, the Supreme Court held that the mail fraud statute, 18 U.S.C. § 1341, does not prohibit schemes to deprive employers of their agents' faithful services. *McNally v. United States,* —— U.S. ——, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987). Keane immediately filed this petition for a writ in the nature of coram nobis, see 28 U.S.C. § 1651(a), asking the district court to vacate the judgment of conviction and order the Treasury to return the fine of $27,000. The district judge who had conducted the trial in 1974 denied the application, 678 F.Supp. 708 (N.D.Ill.1987), concluding that Keane's acts are mail fraud even under *McNally.*

The indictment charged, and the evidence showed, see *United States v. Keane,* 522 F.2d 534, 539–44 (7th Cir.1975), *cert. denied,* 424 U.S. 976, 96 S.Ct. 1481, 47 L.Ed. 2d 746 (1976), that Keane—one of Chicago's most influential political figures—and two of his friends formed a partnership that acquired more than 1,800 parcels of

---

* Honorable Myron L. Gordon, Senior District Judge for the Eastern District of Wisconsin, sitting by designation.

land. The partnership acquired the land from the City at property-tax-delinquency auctions; it held the land through an Illinois land trust, a device that permits beneficial owners of land to conceal their interests. Armed with knowledge about the City's (and other governmental bodies') plans, Keane told his partners what parcels to bid on. The original owners had two years to redeem their land by paying the taxes; after this redemption period passed, Keane used his position as Chairman of the Finance Committee to help the partnership obtain clear title to the parcels. The tax sale left in place any "special assessments": charges for neighborhood sewers, roads, and the like. Payments of these assessments flowed to a special assessment fund—which financed public improvements by issuing bonds, and to which the bondholders looked for repayment. If the landowners did not pay the full assessments (as Keane's partnership did not) the City Council would authorize sale of the land at auction with the proceeds applied to the special assessments. The Finance Committee would recommend a minimum price, usually 30% of the assessment due; the Council regularly approved the Finance Committee's recommendations. Keane induced the Finance Committee to set a reserve bid of 10% of the amount of the special assessments outstanding on the parcels his partnership owned; the City Council approved; its members did not know of Keane's interest in the parcels receiving this special treatment.

After the auctions the partnership held fee simple title to more than 1,000 of the original 1,800 parcels. Keane then induced his friends in public agencies to buy these parcels. Some went to the Chicago Housing Authority, some to the Metropolitan Sanitary District, some to smaller instrumentalities. The indictment charged and evidence showed that the prices for some parcels were inflated and that the partnership made more than $160,000 in profits; Keane contended, and a state court later concluded, *Chicago ex rel. Cohen v. Keane*, 105 Ill.App.3d 298, 61 Ill.Dec. 172, 434 N.E.2d 325 (1st Dist.1982), that the partnership lost money on the whole she-

bang. The jury was told that it need not find that Keane made a profit in order to convict him; it was enough, the instructions said, if Keane acted in an official capacity without telling anyone about his private interest, depriving the City and its residents of the candor and faithfulness required of a fiduciary.

Keane objected before, during, and after trial to the "intangible rights" aspect of the indictment and jury instructions. The district court in 1974, and this court in 1975, disagreed with his position; the Supreme Court in 1976 denied Keane's petition for a writ of certiorari. If this were an ordinary civil case Keane would have to swallow his losses. *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388 (1984). Everyone is entitled to a full and fair opportunity for litigation, and no one is entitled to multiple opportunities. The decision the second time around is not necessarily more accurate than the first and comes at great cost to legitimate interests in finality—not only the interests of the prevailing party but also the interests of the judicial system. Rules of preclusion induce parties to concentrate their energies and resources on getting things right the first time. Cf. *Wainwright v. Sykes*, 433 U.S. 72, 88–89, 97 S.Ct. 2497, 2507–08, 53 L.Ed.2d 594 (1977). The prospect of relitigation would reduce the effective stakes of the first case, leading to an erosion in accuracy. From a systemic perspective, time consumed relitigating one case subtracts from the time available to litigate others. Litigants must wait in a longer queue, receive less judicial attention, or both. It would not be possible to stop with two decisions; if hindsight shows the error of the first decision, it may show error of the second in turn. The high costs of multiple decisions in the same case have led the Supreme Court to conclude that a party does not get a second chance even if an intervening decision of that Court makes pellucid the error of the original decision. *Federated Department Stores, Inc. v. Moitie*, 452 U.S. 394, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981). Given *Moitie*, there can be no

doubt that if in a civil case Keane had been found liable for fraud and assessed $27,000 as damages, a later decision of the Supreme Court rejecting the reasoning used in his case would not have entitled him to a fresh adjudication.

For more than half of Keane's life, the same approach would have been employed in criminal litigation. The writ of habeas corpus supplied an avenue of collateral attack, but only in the event the court rendering the judgment of conviction was without jurisdiction to do so. See Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv.L.Rev. 441 (1963). Through the first part of this century judges became increasingly inventive in classifying errors as "jurisdictional" until, in *Brown v. Allen*, 344 U.S. 443, 73 S.Ct. 397, 97 L.Ed. 469 (1953), the Supreme Court held that a constitutional error could support issuance of the writ even if the trial court unquestionably had jurisdiction. Congress codified *Brown* in 1966 by amending 28 U.S.C. § 2254, and the parallel statute for federal prisoners, 28 U.S.C. § 2255, establishes the same scope of review as § 2254. *United States v. Hayman*, 342 U.S. 205, 219, 72 S.Ct. 263, 272, 96 L.Ed. 232 (1952). Both statutes, however, deal with persons "in custody", and their relaxation of the finality rules is justified by the ongoing deprivation of liberty. A fresh look may prevent the imposition of unjustified, yet continuing, punishment. A criminal defendant fined but not imprisoned is not suffering an ongoing punishment and may not attack his sentence under these statutes. *Wright v. Bailey*, 544 F.2d 737, 739 & n. 2 (4th Cir. 1976) (collecting cases). Once a defendant has been released from prison and relieved of civil disabilities, even a collateral attack begun during confinement becomes moot, showing that only the continuing interference with a liberty interest justifies relitigation. *Lane v. Williams*, 455 U.S. 624, 102 S.Ct. 1322, 71 L.Ed.2d 508 (1982). Civil disabilities (collateral consequences) may prevent a challenge begun during imprisonment from becoming moot on release, *Sibron v. New York*, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968), but civil disabilities alone are not "custody" authorizing collateral litigation. *Westberry v. Keith*, 434 F.2d 623 (5th Cir.1970) (fine and revocation of drivers' license do not add up to custody).

The norm of finality, with an exception while custody or another deprivation of liberty continues, is the background for understanding the writ of error coram nobis. Judgments are not final on the day when rendered; our legal system gives parties some period within which to seek reconsideration, a privilege that was especially important before the modern institution of appellate review. Many final judgments were not appealable. The permissible time within which to seek rehearing customarily was the "term of court"—a period that lasted until the judges moved on to some other city (or, in metropolitan courts, for a few months). This produced erratic results, for some judgments were rendered on the last day of the term and others evaded rehearing because the events justifying that relief were unknowable before the end of the term. The writ of error coram nobis developed as a run 'round the end-of-term limitation, one applicable to civil and criminal cases alike. It was justified not by special considerations attending loss of liberty but by perceived limitations of the reconsideration process in all litigation. See *United States v. Morgan*, 346 U.S. 502, 74 S.Ct. 247, 98 L.Ed. 248 (1954) (tracing the history of the writ).

Because frequent use of such a writ would discard the benefits of finality, it has been reserved for compelling events. Its descendent in civil cases, Fed.R.Civ.P. 60(b)(6), authorizes reopening a judgment more than a year after its entry only in unusual circumstances, and even then the denial of relief may be upset only if no reasonable person could have taken the position adopted by the district court. *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 830–33 (7th Cir.1985). The writ was, if possible, harder to obtain in criminal cases. Claims that could have been raised by direct appeal are outside the scope of the writ. *United States v. Mayer*, 235 U.S. 55, 69, 35 S.Ct. 16, 19–20, 59 L.Ed. 129 (1914).

As applied to criminal cases, the writ was used to raise claims that were not apparent from the face of the record and understandably not raised at trial (e.g., that the uncounseled defendant was insane at the time of the plea or that the defendant had entered the guilty plea out of fear of mob violence). The range of cognizable claims is somewhat broader today in many jurisdictions, but the writ is still generally limited to claims that rest on facts dehors the record.

Yale Kamisar, Wayne R. LaFave & Jerold H. Israel, **Modern Criminal Procedure** 1468 (6th ed. 1986). The writ of error coram nobis is limited to defects that sap the proceeding of any validity, see *Mayer;* *United States v. Addonizio*, 442 U.S. 178, 186, 99 S.Ct. 2235, 2241, 60 L.Ed.2d 805 (1979) (dictum); *United States v. Scherer*, 673 F.2d 176, 178 (7th Cir.1982); *United States v. Dellinger*, 657 F.2d 140, 144 (7th Cir.1981). It was and is not a device to relitigate issues fully ventilated at the time of the conviction. Section 2255 permits relitigation if the defendant is in custody and there is an intervening change of law. See *Davis v. United States*, 417 U.S. 333, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974); *Sanders v. United States*, 373 U.S. 1, 15–17, 83 S.Ct. 1068, 1077–78, 10 L.Ed.2d 148 (1963); *United States v. Mazak*, 789 F.2d 580 (7th Cir.1986). The reason to bend the usual rules of finality is missing when liberty is not at stake. Courts must conserve their scarce time to resolve the claims of those who have yet to receive their *first* decision.

To the extent a petition for a writ of error coram nobis is a way to relitigate claims (as opposed to raising claims previously unavailable or litigated on an incomplete record), a petitioner must satisfy at least two other requirements. He must demonstrate that the judgment of conviction produces lingering civil disabilities (collateral consequences). He also must demonstrate that the error is the type of defect that would have justified relief during the term of imprisonment. Keane fails on both counts.

When holding in *Morgan* that coram nobis may be used to avoid federal criminal convictions, the Supreme Court observed, 346 U.S. at 512–13, 74 S.Ct. at 253, that the writ is valuable to bring an end to what may be substantial civil disabilities attached to criminal convictions. These include loss of the rights to vote, hold occupational licenses (including law licenses), and bear arms; criminal convictions also may lead to enhanced penalties for future offenses. These future effects may call for a fresh look at the conviction. Just as a continuing civil wrong is not beyond redress because its genesis is old, see *Bazemore v. Friday*, 478 U.S. 385, 106 S.Ct. 3000, 3006–07, 92 L.Ed.2d 315 (1986), so the ongoing effects of a criminal conviction justify the allocation of the judicial resources necessary to take a fresh look. Criminal convictions sometimes produce financial penalties and diminish the reputation of the defendant, but these do not entail continuing legal effects of a judgment. Civil judgments frequently have the same effects, which do not authorize indefinite relitigation. Many courts therefore have held that coram nobis may be employed if and only if the petitioner is suffering civil disabilities unique to criminal convictions. E.g., *United States v. Hay*, 702 F.2d 572 (5th Cir.1983); *Puente v. United States*, 676 F.2d 141, 145 n. 2 (5th Cir.1982). We agree with this approach, which reflects the rules of finality ordinarily applicable while appreciating that the special disabilities criminal convictions may bring justify additional scrutiny in an effort to curtail any lingering effects of error. (One case, *United States v. Lewis*, 478 F.2d 835 (5th Cir.1973), permitted use of the writ when the only stake was repayment of a fine, but the court did not discuss the propriety doing so, and passing by such a question in silence does not establish a precedent.)

Keane was disbarred after his conviction, and this sort of civil disability could support the issuance of the writ. The Supreme Court of Illinois readmitted Keane to practice in 1984, however. We inquired at oral argument whether Keane is under any disability today; counsel answered that he is not, and there is no realistic threat that Keane's conviction could produce any

disability or detriment in the future. The conviction is a black mark, but that is not a civil disability, and we decline to adopt the Ninth Circuit's apparent view that anyone may obtain coram nobis just to bask in the satisfaction of having his position vindicated. *Hirabayashi v. United States*, 828 F.2d 591 (9th Cir.1987). A strong emotional interest is not enough to produce an Article III case or controversy, e.g., *Allen v. Wright*, 468 U.S. 737, 754–56, 104 S.Ct. 3315, 3326–27, 82 L.Ed.2d 556 (1984), and a blot on one's escutcheon, divorced from any particular entitlement to a "clean record", does not even involve a liberty interest. Compare *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976), with *Fleury v. Clayton*, 847 F.2d 1229 (7th Cir. 1988). Litigation does not exist for its own sake; declamations by courts are not the objective of cases; there must be a concrete dispute about legal *entitlements* to justify a remedy. Cf. *Alliance to End Repression v. Chicago*, 820 F.2d 873, 876 (7th Cir.1987). Keane was amerced $27,-000, which gives him a stake sufficient to produce a "case or controversy", but the fine is no different from the award of damages in civil litigation. It is a sunk cost rather than a continuing disability producing additional injury as time passes. A civil judgment that Keane defrauded the City out of $27,000 would have produced both the reputational and financial injury Keane now suffers, but neither would have permitted reopening a judgment 12 years after it became final. Keane is not burdened by continuing disabilities that could justify the investment of judicial time necessary to decide whether he is entitled to vindication.

■ We do not doubt that the return of a fine is permissible relief if a writ in the nature of coram nobis is otherwise justified, see *Pasha v. United States*, 484 F.2d 630 (7th Cir.1973); *Neely v. United States*, 546 F.2d 1059 (3d Cir.1976). We hold only that the prospect of getting money back is not enough by itself to support belated review. To the extent *United States v. Mandel*, 672 F.Supp. 864 (D.Md.1987), holds that the government's retention of a fine is a civil disability justifying issuance

of the writ, we do not agree with it. There may be a further obstacle, the need to find statutory authority for repayment, which otherwise would be blocked by sovereign immunity. The Little Tucker Act, 28 U.S. C. § 1346(a)(2), permits district courts to award sums of $10,000 or less; Keane wants $27,000, which only the Claims Court may award. The Tucker Act (big and small) also is limited to claims founded on the Constitution, statute, regulation, or contract. Keane does not contend that Congress is forbidden by the Constitution to treat as criminal the conduct in which he engaged, or that any statute requires the United States to give him $27,000. *McNally* holds only that the mail fraud statute does not cover a particular kind of behavior. Our conclusion that financial stakes do not adequately distinguish this from a routine civil matter makes it unnecessary to explore limits on the restitution of criminal fines, just as *United States v. Sams*, 521 F.2d 421 (3d Cir.1975), avoided the same complex issue by declining on other grounds to issue the writ.

■ If Keane could clear all of these hurdles, he would face one final obstacle: even one still in custody may not obtain collateral review of every legal error. Surely relief to one out of custody is not available more readily than relief to one still serving his sentence. Section 2255 provides relief for a prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or Laws of the United States". *Davis* holds that if the indictment does not state an offense, the resulting custody violates the laws of the United States. The Court observed, however, that a statutory law short of a "fundamental defect" that produces a "miscarriage of justice" may not be raised under § 2255. 417 U.S. at 346, 94 S.Ct. at 2305, quoting *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 471, 7 L.Ed.2d 417 (1962); see also *United States v. Timmreck*, 441 U.S. 780, 99 S.Ct. 2085, 60 L.Ed.2d 634 (1979); *Kramer v. Jenkins*, 803 F.2d 896, modified, 806 F.2d 140 (7th Cir.1986). The failure of the indictment to state an offense may be

raised at any time, because "conviction and punishment ... for an act that the law does not make criminal", *Davis*, 417 U.S. at 346, 94 S.Ct. at 2305, is a paradigm miscarriage of justice. See also Fed.R.Crim.P. 12(b)(2). *Davis* shows that a change in law negating the presence of a crime may and must be applied retroactively on review under § 2255. See also, e.g., *United States v. Shelton*, 848 F.2d 1485 (10th Cir. 1988) (en banc); *Ingber v. Enzor*, 841 F.2d 450, 453–54 (2d Cir.1988).

■ *McNally* knocked out the prosecution's principal theory in Keane's case but does not establish that the indictment failed to state an offense. An indictment adverting principally to rights to faithful service still may lead to a valid conviction if the prosecution shows that the defendant defrauded someone out of property, including intangible property. *United States v. Wellman*, 830 F.2d 1453 (7th Cir.1987). The indictment charges Keane with a scheme that had a substantial potential to take other people's property by fraud. It alleged, for example, that Keane used the City's confidential information about its plans for acquiring property. Valuable confidential information is a form of property, see *Carpenter v. United States*, —— U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987). It alleged that Keane induced the City Council to set a reserve price of only 10% of the special assessments, instead of the usual 30%, which could have reduced the fund's realizations. It alleged that Keane induced his friends to buy the parcels, on behalf of public agencies, for more than they were worth. Now it may well be that none of this cost the City or anyone else one red cent. The information may have been worthless; the reduction in the reserve bids would have been immaterial if competition developed at the auctions (and it is in the bondholders' interests to ensure that the auctions are competitive); the efforts to sell the property for more than it was worth may have come to naught. These were jury questions and do not detract from the validity of the indictment. True, the victims (if any) would have been the special assessment bondholders and the taxpayers of the special districts (such as

the Metropolitan Sanitary District) rather than the City Treasury. But the mail fraud statute proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed in raking off cash, a point no less valid today than when emphasized on direct appeal, see 522 F.2d at 545 (citing cases), and the statute does not limit the category of victims. (Keane argues as if defrauding one's employer is the only form of mail fraud, so that he is entitled to acquittal if the loss fell on the bondholders rather than the City.) Although phrased in terms of intangible rights to honest services, the indictment notified Keane of these aspects of the scheme, and much effort was spent at trial trying to figure out who, if anyone, was the poorer as a result of Keane's machinations.

We do not say that Keane's conviction would today be affirmed on appeal. The intangible rights approach was such a centerpiece of the trial that it would be difficult to conclude, as we did in *Wellman*, that a jury instructed as this one was **necessarily** found the existence of a scheme to defraud someone of "property" within the meaning of *McNally, Carpenter*, and, to cite only a few of our own recent cases, *Ward v. United States*, 845 F.2d 1459 (7th Cir.1988); *United States v. Eckhardt*, 843 F.2d 989 (7th Cir.1988); *United States v. Holzer*, 840 F.2d 1343 (7th Cir.1988); *United States v. Gimbel*, 830 F.2d 621 (7th Cir.1987). As we have emphasized, however, and as Keane's lawyer conceded at oral argument, if the indictment states an offense, that is the end of things for relief in the nature of coram nobis. E.g., *United States v. Hobson*, 825 F.2d 364, 366 (11th Cir.1987). Indeed, even one count stating an offense would be the end of things, for a single felony conviction supports any civil disabilities and reputational injury Keane may have to endure. An error in the jury instructions—when a valid conviction could have been had under different instructions on at least one count of this 17–count indictment—is not the sort of fundamental defect that produces a complete miscarriage of justice. Without such a defect,

there could not be relief even while imprisonment continued. There certainly should not be relief at some later date. Keane does not want an order setting his case for a new trial, with all the risks of fresh punishment that entails; he wants absolution without risk or cost. The judicial system cannot offer him a declaration that he did no wrong; we could do no more than say that the verdict in 1974 was tainted by error. A hunt for error, divorced from the possibility of a definitive answer, is not justifiable. All we can do now, all a court should do now, is inquire whether the indictment charged Keane with a crime. This indictment did.

To sum up, three independently sufficient reasons require the denial of relief in the nature of coram nobis. First, the legal contention Keane presents was raised and resolved adversely to him on a full record after the opportunity to ventilate all arguments; second, Keane is not under a civil disability as a result of his conviction; third, the indictment states an offense. We are acutely conscious that this leaves open the possibility that Keane must bear the emotional weight and public obloquy of conviction even though a jury instructed as *McNally* requires might have acquitted him. In a world of unlimited resources this would not happen. No one can accept without unease the thought that the legal system tolerates erroneous convictions. Yet we live in a world of scarcity, one in which that most inflexible commodity, time itself, sets a limit on our ability to prevent and correct mistakes. Every legal system tolerates a risk of error. It tries to find procedures that will hold error to a minimum, but then it must move on. Bygones are beyond recall. Nothing can give Keane back the time he spent in prison, where perhaps he did not belong. The reopening of closed cases, though, means attention to bygones at the expense of others in need of initial adjudication. Poring over the records of old mail fraud cases—not only Keane's but also the many thousands of other cases decided under the intangible rights approach prior to *McNally* —would divert untold judicial hours from pressing business. At some point the judicial system must close old files and turn to the future, regretfully accepting the risk of error lest the quest for perfect justice become the enemy of adequate justice. That time has come for Mr. Keane.

AFFIRMED.