**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Danny O. CHERIF, Defendant–
Appellant.**

No. 90–2118.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 13, 1991.

Decided Aug. 30, 1991.

Michael R. Pace (argued), Barry R. Elden, Asst. U.S. Attys., Office of the U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Douglass G. Hewitt, Michael P. Mullen (argued), Burke, Wilson & McIlvaine, Chicago, Ill., for defendant-appellant.

Before MANION and KANNE, Circuit Judges, and GRANT, Senior District Judge.*

MANION, Circuit Judge.

Danny O. Cherif worked in the International Financial Institutions Department of the First National Bank of Chicago ("First Chicago") from October 1979 until December 1987. In late 1987, First Chicago eliminated Cherif's job as the result of an internal reorganization. Disgruntled by his firing and with the hope of making some easy money, Cherif devised a scheme to get back at First Chicago. That scheme, as we noted in a related case, was "simple [and] cunning." *SEC v. Cherif*, 933 F.2d 403, 406 (7th Cir.1991). While an employee at First Chicago, Cherif had been issued a magnetic identification card ("keycard") that allowed him to enter the bank after normal business hours. Cherif was to surrender his keycard when his employment ended on December 31, 1987. However, in early January 1988 Cherif persuaded Kelly Reiter, a secretary at First Chicago with whom he was romantically involved, to type a memorandum to the bank's data entry department ostensibly from Francois Van Reepinghen, a senior vice president in the International Financial Institutions Department. The memorandum falsely told the data entry department that Cherif needed an active keycard to enter the bank to complete a special project. Cherif forged Van Reepinghen's signature to the memorandum, and based on Van Reepinghen's apparent request the data entry department reactivated Cherif's keycard. Cherif repeated this trick in late August 1988 to prevent the data entry department from deactivating the keycard at that time.

In a period of over a year after his employment ended, Cherif was able to use his keycard over 30 times on nights and weekends to enter the bank. Once in the bank, Cherif would head for the bank's Specialized Finance Department. The Specialized Finance Department, which shared the same floor of the bank as Cherif's old department, financed extraordinary business transactions such as corporate restructurings, tender offers, and leveraged buyouts. In connection with proposed transactions, the Specialized Finance Department would accumulate information from various sources and generate its own information. While the information included publicly available information concerning things such as a company's business and financial performance, the information received and generated also included specific information about a company's future business strategy, management structure, and future financial performance. The Specialized Financial Department also generated documents known as "deal memos" for each transaction, which described the proposed transactions in detail, and "deal lists" which listed the various transactions the department was considering. First Chicago treated all this information as confidential, and went to some lengths to keep the information confidential. For example, First Chicago required all its employees to sign an "integrity policy" by which employees agreed not to disclose confidential information to unauthorized people. Cherif was aware of this policy, having signed it several times himself while a First Chicago employee.

Before his termination in December, 1987, Cherif had traded sporadically, and generally unsuccessfully, in the stock market. Cherif's "luck" changed markedly after his forays into the Specialized Finance Department, principally because he would obtain confidential information about proposed deals the Specialized Finance Department was considering, and trade almost exclusively in the stocks of companies involved in those deals. Cherif executed these trades in brokerage accounts located at Charles Schwab & Co., Quick & Reilly, and Berthel, Fisher & Fleishman Financial Services. Cherif opened all three accounts in early-to-mid 1988, before or shortly after he began to use his reactivated keycard to enter the bank. Cherif opened the account

---

* The Honorable Robert A. Grant, Senior District Judge for the Northern District of Indiana, is sitting by designation.

at Quick & Reilly in the name of and with a $100,000 check from Khaled Sanchou, a Tunisian resident and Cherif's cousin by marriage. However, Cherif, who was authorized to trade in the account, was the only person to trade in the account and received all trading statements and confirmations from the account. The gains in the Schwab, Quick & Reilly, and Berthel, Fisher accounts totaled well over $200,000.

Cherif was not the only person to profit from trading on the information he obtained from the bank. Cherif shared the information with (possibly among others) William Bronec, Jr. Bronec had been a fellow employee of Cherif's until 1985, and was one of Cherif's best friends. Bronec invested in several stocks based on information Cherif had obtained from the bank. Cherif told Bronec about how he had been obtaining information by entering the bank with his reactivated keycard. Cherif also showed Bronec a deal list he had taken and a deal memo that Reiter had obtained for him. Bronec and his father made over $9,700 in their own accounts from stocks Cherif recommended. Cherif also traded in Sanchou's Quick & Reilly account on Bronec's behalf, and made over $6,300.

Cherif's scheme unraveled in May 1989 when the SEC and FBI began investigating his trading. As part of this investigation, FBI agents interviewed Cherif. During this interview, Cherif told the agents that Reiter "did not know anything about this stuff" and that he had never discussed his scheme or his stock transactions with Reiter. Cherif also told the agents that a $6,700 check he had given Bronec from the Sanchou account was a "gift for financial consulting" that Bronec had done. In fact, however, Cherif had told Reiter about his forays into the bank and his use of the information he obtained in trading stocks, and the check to Bronec was for profits Cherif had made in trading on the Sanchou account with Bronec's money.

Meanwhile Bronec, apparently figuring that a clear conscience, self-preservation, or both were more important than friendship, decided to cooperate with the FBI. Early in the morning on May 19, Bronec met with Cherif to discuss their predicament. Unbeknownst to Cherif, Bronec was wearing a tape recorder to this meeting. At the meeting Cherif told Bronec among other things that, "if they find I have an active ID I mean, I'm probably screwed," and "I'm the one that did it all...." The FBI arrested Cherif in his home shortly after his meeting with Bronec.

A grand jury indicted Cherif on multiple counts of mail and wire fraud, 18 U.S.C. §§ 1341 and 1343, one count of conspiracy to commit mail and wire fraud, 18 U.S.C. § 371, and one count of lying to FBI agents, 18 U.S.C. § 1001. (The district court dismissed counts charging Cherif with bank burglary, 18 U.S.C. § 2113(a), and obstructing justice, 18 U.S.C. § 1503.) The indictment also charged Bronec with conspiring to commit mail and wire fraud, a charge to which Bronec pleaded guilty. After trial, the jury convicted Cherif of conspiracy, lying to the FBI agents, and numerous counts of mail and wire fraud. The district court sentenced Cherif to 24 months in prison. Cherif appeals both his conviction and sentence, raising a grab-bag of issues.

## I.

The mail and wire fraud statutes make it a federal crime for a person who "having devised ... a scheme or artifice to defraud or obtain money or property by means of false or fraudulent pretenses, representations, or promises" to use the mail or interstate wire communications facilities "for the purpose of executing" the scheme. 18 U.S.C. §§ 1341 & 1343. The indictment against Cherif charged that he devised a scheme to defraud First Chicago and its clients of confidential business information by fraudulently reactivating his keycard and using it to enter the bank to obtain the information. The indictment further alleged that Cherif used the information to obtain money by trading in the stock market based on that information. The mailings and wirings used to execute the scheme, according to the indictment, were

the various mailings and wirings necessary to execute the stock trades.

■■ Cherif contends that the indictment did not state a violation of the mail and wire fraud statutes and that the evidence was insufficient to show that he violated those statutes. Cherif posits several reasons why this is so. First, Cherif contends there was no scheme to defraud because he obtained the bank's information by trespass or burglary, not by fraud. This contention cannot be serious. Cherif was able to enter the bank only because he fraudulently retained his keycard. Cherif forged Van Reepinghen's signature to phony memoranda not once but twice: first, in January 1988 when he originally tricked the bank into reactivating his keycard, and a second time in August 1988, when he tricked the bank into extending the time he could keep his keycard. Moreover, every time he used the keycard Cherif, in effect, falsely represented that he was a bank employee entitled to be in the bank. "The words 'to defraud' in the mail fraud statute have the 'common understanding' of 'wronging one in his property rights by dishonest methods or schemes ...'" *Carpenter v. United States*, 484 U.S. 19, 27, 108 S.Ct. 316, 321, 98 L.Ed.2d 275 (1987) (quoting *McNally v. United States*, 483 U.S. 350, 358, 107 S.Ct. 2875, 2880, 97 L.Ed.2d 292 (1987)). Cherif's access to and ability to obtain the bank's information depended on outright lies, misrepresentations, and forgery; that is enough to constitute a scheme to obtain the bank's information by fraud under the mail and wire fraud statutes.

■ This brings us to Cherif's second contention: that the mailings and wirings alleged in the indictment were not in furtherance of his scheme to defraud. Cherif argues that the mailings and wirings necessary for his stock transactions occurred long after he acquired the information about those stocks from the bank. In effect, Cherif divides the scheme alleged in the indictment into two separate schemes: a scheme to obtain information from the bank, and a scheme to obtain stock from the people from whom he bought stock and

money from the people to whom he sold stock. According to Cherif, the mailings may have furthered his stock trading but since there was no fraud involved in the stock trading the mailings did not further a scheme to defraud. And, since he had already obtained the information long before the mailings and wirings occurred, the mailings and wirings could not have been in furtherance of the scheme to obtain information.

We agree with the district court that Cherif cannot parse his scheme as he attempts to do here. The indictment alleged that Cherif fraudulently obtained information to use for his own benefit and (at least potentially) the injury of others. Rather than being separate from the scheme to obtain information, the stock trades were an integral part of that scheme. Indeed, the trades were the whole point of the scheme.

The mailings and wirings in this case are similar to those the Supreme Court found to be in furtherance of the scheme in *Carpenter v. United States*. In *Carpenter*, a Wall Street Journal writer misappropriated confidential business information (the publication schedule and contents of the Journal's "Heard On The Street" column) from the Journal and passed the information on to stockbroker friends who executed trades based on the information. The alleged mailings and wirings were those necessary "to print and send the Journal to its customers." 484 U.S. at 28, 108 S.Ct. at 322. Following Cherif's reasoning, the scheme in *Carpenter* would have ended when the Journal writer stole and passed on the information, so that the mailings and wirings necessary to print and send the Journal would not have been in furtherance of the scheme. Yet, the Supreme Court with little ado held that those mailings and wirings were in furtherance of the scheme because the circulation of the "Heard On The Street" column was an integral part of the scheme. It was the column's circulation that affected stock prices and made it possible to profit by trading on the leaked information. *Id.* Likewise, the mailings and wirings essential to the trades in this

case were in furtherance of Cherif's scheme because they were incidental to an integral part of his scheme. See *Schmuck v. United States*, 489 U.S. 705, 711, 109 S.Ct. 1443, 1447, 103 L.Ed.2d 734 (1989) (mailings are part of the execution of a fraud if they are " 'incident to an essential part of the scheme' ") (citation omitted); see also *United States v. Grossman*, 843 F.2d 78, 86 (2d Cir.1988) (holding that mailings of confirmation slips after trades made on misappropriated information were in furtherance of the scheme to misappropriate and trade on the information.).

■ Cherif also argues that the indictment did not allege, and the evidence was not sufficient to prove, a scheme to defraud anybody of property. In *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), the Supreme Court rejected the so-called "intangible rights" theory of mail fraud, holding that the mail fraud statute makes criminal only schemes intended to deprive people of property rights. This holding also applies to the wire fraud statute. *United States v. Gimbel*, 830 F.2d 621, 627 (7th Cir.1987). Congress has since rejected the result in *McNally*. 18 U.S.C. § 1346, enacted November 18, 1988, provides that "the term 'scheme or artifice to defraud' includes a scheme to deprive another of the intangible right of honest services." Cherif's scheme, and his conspiracy with Bronec, began before Congress enacted § 1346 but ended well after the statute's enactment. It is possible to argue that § 1346 might apply to the conspiracy and (at least) to the mail and wire fraud counts that involved mailings and wirings occurring after November 18, 1988. See *United States v. Pace*, 898 F.2d 1218, 1238 (7th Cir.1990). But because the government has not made this argument, and because the jury was not instructed concerning an intangible rights theory, we will analyze the entire case under *McNally*'s requirement that mail and wire fraud involve a scheme to deprive someone of property rights.

In *Carpenter*, the Court held that although the mail and wire fraud statutes do not encompass schemes to deprive people of intangible rights, the statutes do encompass schemes to deprive people of intangible property. 484 U.S. at 25, 108 S.Ct. at 320. In *Carpenter*, the Court held that confidential business information—in that case, the contents and publication schedule of the Wall Street Journal's "Heard On The Street" column—was property protected by the mail and wire fraud statutes. *Id.* at 25–26, 108 S.Ct. at 320–21. The indictment in this case alleged that Cherif obtained confidential business information belonging to the bank and its clients and the evidence showed that the bank treated all information in the Specialized Finance Department, both obtained from clients and self-generated, as confidential. Cherif, however, contends for several reasons that even after *Carpenter* the confidential information he obtained was not property, or that the government did not prove that it was protectible property.

First, Cherif argues that despite *Carpenter*'s general holding that "[c]onfidential business information has long been recognized as property," *Carpenter* was really premised on the fact that the contents of the "Heard On The Street" column was the Wall Street Journal's "stock in trade," its product. From this premise, Cherif argues that since the information in the Specialized Finance Department was not the bank's stock in trade—the bank being in the business of lending money and providing financial services, not publishing news or information—the business information in the Specialized Finance Department was not property under *Carpenter*. But the information Cherif purloined from the Specialized Finance Department was an important part of that bank department's background for developing its stock in trade. The department contracted with other companies to gather and protect the information. It was a unique product and Cherif stole it. In any event, we have already rejected Cherif's narrow reading of *Carpenter* in *FMC Corp. v. Boesky*, 852 F.2d 981, 990–91, 991–92 n. 21 (7th Cir.1988). In that case, FMC alleged that Ivan Boesky had purchased a large block of FMC stock based on information about FMC's recapitalization. This allegedly raised the recapi-

talization's cost substantially. The district court dismissed the suit for lack of subject matter jurisdiction, holding that FMC had alleged no injury that would give it standing to sue Boesky. We reversed, holding that FMC had been injured by Boesky's misappropriation of FMC's right to use exclusively its confidential business information, which we categorized as property based on *Carpenter*. *Id*. at 990–91. The majority in FMC read *Carpenter* as holding that " 'even though "confidential business information" is intangible, it "has long been recognized as property." ' " *Id*. at 992 n. 21 (quoting *Grossman*, 843 F.2d at 86). See also *United States v. Elliott*, 711 F.Supp. 425, 427–28 (N.D.Ill.1989).

What Cherif is really arguing is that the information had no value to the bank or its customers. That is not so. The information may not have been the bank's only stock in trade but it was part of it: it was the "raw material" from which it produced its "product" (financing services). Without the information it gathered and generated, the bank could not offer its services to customers. Moreover, the confidentiality of the information was valuable to both the bank and its customers. Leaks could blow a deal, something damaging to the bank (because it would lose business) and the customers (because they might have to forego a possibly profitable business opportunity). The evidence showed that many of the bank's customers required the bank to sign confidentiality agreements, and it was reasonable to infer from the evidence that other customers at least tacitly expected confidentiality. Given the importance of confidentiality to the bank's customers, it is not idle speculation to conclude that the confidentiality of the information was commercially valuable to the bank because breaches of confidentiality could harm the bank's reputation and result in lost business (or, conversely, that maintaining confidentiality would enhance the bank's reputation, leading to more clients or at least fewer lost clients). See *Grossman*, 843 F.2d at 86.

Cherif also argues that because some of the information in the Specialized Finance Department was publicly available, and because the government's evidence did not show specifically what information he obtained, the government did not prove that he obtained confidential information. A major premise underlying this argument seems to be that to violate the mail and wire fraud statutes, a scheme must actually succeed in obtaining somebody else's property. That premise is incorrect. "[T]he mail fraud statute [and the wire fraud statute] proscribes fraudulent *schemes;* it does not confine penalties to those whose schemes succeed...." *United States v. Keane*, 852 F.2d 199, 205 (7th Cir.1988). The district court instructed the jury that "the mail or wire fraud statutes can be violated whether or not there is any loss or damage to the victim of the crime," indicating to the jury that the scheme did not have to be successful to violate the law. In this case, Cherif schemed to take information from the bank and use it to trade in the stock market. It is reasonable to infer that Cherif wanted confidential information, information not generally available to the public. Confidential information would be more useful to Cherif than public information, since it would give him a trading advantage over those who could rely only on public information. Besides, if Cherif wanted public information, there were plenty of places for him to find it; he did not have to sneak into the bank's Specialized Finance Department. The evidence was sufficient to show Cherif schemed to obtain confidential information (that is, property). If the information he obtained turned out not to be confidential business information, that means only that Cherif's scheme was unsuccessful. To say that Cherif may have obtained only public information (when he sought to obtain confidential information) is to say that Cherif was unlucky or a bad judge of the value of information, not that he did not commit mail and wire fraud.

In any event, it is clear that the jury could find that Cherif did obtain valuable confidential information. The very fact that the bank was considering financing a particular deal was confidential. If nothing else, the jury could easily conclude Cherif was able to obtain this information

during his forays into the bank. The evidence was sufficient for the jury to find that Cherif schemed to obtain confidential business information from the bank, and that he did indeed obtain and trade upon such information.

## II.

■ Cherif also complains that the district court erred by rejecting several jury instructions he proposed, and as a consequence inadequately instructed the jury. Cherif first argues that the district court erred by refusing to instruct the jury that to convict him of mail and wire fraud, the government had to prove that he "obtained confidential business information that was confidential when the defendant learned the information and which was confidential at the time the defendant purchased stock." As should be apparent from our previous discussion concerning the sufficiency of the evidence to show Cherif actually obtained confidential business information, this instruction was incorrect as a matter of law. The jury did not have to find that Cherif actually succeeded in obtaining the bank's confidential information; it had to find only that Cherif schemed to obtain such information. See *Keane*, 852 F.2d at 205. The district court properly instructed the jury that to convict Cherif, it had to find that he devised or participated in the scheme to defraud charged in the indictment, which was a scheme to obtain confidential business information from the bank and trade on the information he obtained.

■ Cherif also complains that the district court failed to define the term "confidential business information" for the jury. Cherif's proposed instruction stated that "confidential business information" was information:

A. Generated by [the bank] or its clients in the course of their business;

B. That was intended by [the bank] or its clients to be kept confidential and which was, in fact, not known to others, except those who have an obligation to keep the information confidential;

C. Could reasonably be believed to affect the value of [the bank's] clients' stock if disclosed; and

D. Which [the bank] or its clients had the right to keep confidential and also had the exclusive right to use prior to public disclosure.

We agree with the government that no such definition was necessary because the ordinary definition of the term "confidential business information" is consistent with any "technical" meaning of that term as defined in *Carpenter*, and because the jury was otherwise adequately instructed. The district court instructed the jury to find Cherif participated in the scheme charged in the indictment; the indictment, in turn, stated that the information Cherif schemed to obtain was information regarding proposed stock transactions provided to the bank by clients or generated by the bank. This comports with the obvious meaning of "business information," which is information the bank used in its business—in this case, information surrounding possible financing of proposed stock transactions.

There was also no need to define "confidential." The common definition of "confidential" is "private" or "secret." Webster's Ninth New Collegiate Dictionary 275. "Private" or "secret" information is nothing more than information that is not generally known to the public. Nothing in the instructions prevented Cherif from arguing to the jury that some of the information in the Specialized Finance Department was publicly available and therefore not confidential, and that if that was the information Cherif sought, he was not seeking the bank's or its clients' property.

■ The district court also properly rejected Cherif's proposed instructions defining the terms "insider" and "insider trading," and telling the jury that it is not a crime simply to trade in stocks while possessing confidential business information. Cherif was indicted and tried for mail and wire fraud, not securities fraud, and the district court fully and fairly instructed the jury on the elements of mail and wire fraud. According to those instructions, the

jury could not have convicted Cherif merely for trading while he possessed confidential business information; the jury had to find also that he participated in a fraudulent scheme to obtain that information.

Despite this, Cherif argues that the insider trading instructions were necessary to cure the "prejudice" and "confusion" caused by the government's "recurring" references to insider trading. This argument is specious. The references to "insider trading" or "inside information" (and they were not numerous) were nothing more than generic references to Cherif's acts in committing the crime charged. The prosecutor never intimated that Cherif was on trial for anything other than mail or wire fraud. Moreover, Cherif's argument assumes that the jurors knew or cared about the intricacies of securities law. The distinction between what is technically "insider trading" and trading on the basis of fraudulently obtained confidential information from the bank is so subtle that it is inconceivable the distinction would have made any difference to the jury. There is no reason to suspect that without Cherif's proposed insider trading instructions the jury would have disregarded the court's mail and wire fraud instructions and convicted Cherif for an uncharged crime.

Cherif raises three other complaints about rejected instructions that deserve little comment. Cherif argues the district court erred by rejecting his proposed alibi instruction. But Cherif's argument is perfunctory, appearing in a footnote with no citation to authority or comment as to why the district court rejected his instruction. The argument is therefore waived. See *United States v. Brown*, 899 F.2d 677, 679 n. 1 (7th Cir.1990). Cherif has also waived his "argument" that the district court failed to instruct the jury that it had to find that confidential business information was a "substantial reason or motivating factor" for his stock trades. This "argument" appears as almost an afterthought, with no elaboration or citation to authority. We see no need to flesh out this offhand comment. Finally, Cherif argues that the district court erred by failing to instruct the jury that the government had to prove the

information he obtained (or more accurately sought to obtain) was material. Again, Cherif offers no authority for this argument and never bothers to explain what he means by materiality or why the information's materiality (by whatever definition) is important to this case. Cherif has also waived this argument.

### III.

Cherif raises several other challenges to his convictions. According to Cherif, the government did not introduce sufficient evidence to support his conviction for violating 18 U.S.C. § 1001 by lying to an FBI agent. The indictment charged that Cherif told FBI Agent Ronald Hosko that Reiter "had nothing to do with nor had knowledge of his stock purchases and sales" when Reiter in fact assisted Cherif in his scheme and knew about his obtaining information from the bank that he used in trading. The indictment also alleged that Cherif told Hosko that the $6,700 check he gave Bronec from Sanchou's account was a "gift for financial services" rather than Bronec's profits from trading in Sanchou's account.

 As for the statement to Reiter, Hosko testified that Cherif told him that Reiter did not know "anything about this stuff" ("this stuff" being his stock trades) and that he never discussed any stocks, stock transactions, or deals involving the bank with Reiter. Reiter, however, testified that she knew that Cherif was going into the bank, knew he was obtaining information, knew he was "making money" with the information (from which, in context, the jury could infer that she knew he was trading in stocks based on the information), and had actually obtained documents from the bank for him. This was certainly sufficient to prove that Cherif lied to Hosko about Reiter's involvement in and knowledge of his scheme. Cherif quibbles about some inconsistencies in Hosko's testimony, and the fact that during cross-examination Reiter testified that she did not know the details of Cherif's stock trading. But none of this would prevent a reasonable jury, viewing the evidence in the light most fa-

vorable to the government, from finding that Cherif lied to Hosko about Reiter.

■ Cherif's argument about his statement concerning the check from Sanchou's account to Bronec is even less persuasive. Again, Cherif quibbles about some uncertainty in Hosko's testimony, but how to interpret Hosko's testimony was for the jury to decide. Cherif also argues that the statement that the check was a "gift for financial consulting" is so internally inconsistent that Hosko's testimony about it was inherently unreliable. That is not so; one could plausibly interpret the statement to mean that Bronec did the consulting work as a favor, expecting no compensation, and that Sanchou gave Bronec a gift in appreciation for his work. Again, the evidence was sufficient for a reasonable jury to find that Cherif lied.

Cherif mentions in passing that the evidence was insufficient to show that Cherif made his statements knowingly and wilfully, and that the statements were not material as a matter of law. As is typical of his approach to briefing much of this case, Cherif cites no authority for these assertions, and in any event does not bother to explain why these assertions might be correct. He has thus waived these two arguments.

■ Cherif's final challenge to the false statement conviction is that the indictment was duplicitous because it included two separate statements, which should have been charged in different counts, in the same count. Again, Cherif cites no authority for his argument. But at least Cherif fleshes this argument out somewhat, explaining that the false statement count was duplicitous because the indictment and instructions allowed the jurors to convict even if they did not unanimously agree on the false statement Cherif made. For example, six jurors might have believed Cherif lied about Reiter but not about Bronec; the other six might have believed exactly the opposite. Although the twelve jurors would not have agreed that Cherif made one of the false statements charged, the jury could still have convicted Cherif.

We need not decide whether the indictment was actually duplicitous. The problem Cherif complains about—the possibility that the jury would convict him even though it did not unanimously agree on what false statement he made—could easily have been cured by an instruction telling the jury that it could convict Cherif on the false statement count only if it unanimously agreed on the false statement he made. Nothing in the record indicates that Cherif ever proffered such an instruction to the district court. In fact, the court gave *Cherif's* instruction on the elements of the false statement count, an instruction that told the jury that to convict Cherif it had to find simply that Cherif "made a false statement." Cherif's proffer of an instruction, given by the court, that caused the possibility that he might be convicted by a less than unanimous finding forecloses Cherif from raising that point on appeal. Cf. *United States v. Serola,* 767 F.2d 364, 373 (7th Cir.1985) (failure to object to instruction telling the jury that it needed to find defendant made "one or more false declarations as charged in the indictment" in a perjury case waived the right to object to that instruction on appeal). Cherif cannot complain about a problem he not only could have tried to cure at trial, but also may have caused with his own submitted instruction.

Moving back to the mail and wire fraud convictions, Cherif argues that he was unduly prejudiced by the introduction of evidence showing that the bank possessed information about, and that he traded in the stocks of, companies other than those the indictment specifically mentioned. Without citing the record or any supporting authority, Cherif characterizes the evidence about these other companies as "other crimes" evidence prohibited by Fed.R.Evid. 404(b). (Consistent with his disdain for legal authority, Cherif does not even cite Rule 404(b)). Cherif's lack of citation to supporting authority waives this argument but in any event it is meritless. The indictment charges that Cherif's scheme involved trading in the stocks of "various companies" about which the bank had information. Stealing and trading on the information

about these companies was part of Cherif's scheme, so the evidence relating to these companies was evidence of the scheme charged and not of "other acts."

Cherif makes two final arguments relating to his convictions. First, in a somewhat confusing argument Cherif seems to assert that the government introduced two documents (a purported "deal list" and "deal memo") without laying a proper foundation. Second, Cherif argues that the government's closing argument was improper. Both these arguments are waived and in any event meritless. Again, Cherif cites no authority to support his contentions. Cherif does not bother to mention the district court's rationale for admitting the documents he complains about, which makes it difficult to assess whether the court properly exercised its discretion. As for the closing argument, Cherif's complaints are nothing more than nitpicking. His major beef seems to be the prosecutor's references to insider trading. As we explained earlier, the references to insider trading were generally descriptive and in any event unlikely to cause the jury to convict Cherif for a crime other than mail or wire fraud.

Before moving on to Cherif's sentencing, one final comment is in order. Cherif's lawyers have raised numerous issues without citation to any authority and in some cases, without any real legal argument. Courts cannot afford to take time from other litigants waiting to have their cases decided to research and construct arguments for attorneys. Even if the press of business were not a concern, to ask the court to do the attorney's work perverts the court's and attorneys' functions. "The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them." *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir.1991) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C.Cir. 1983) (Scalia, J.)). What we have here is antithetical to that premise—the presentation of numerous, and for the most part completely meritless, arguments made

without citation and apparently from the tops of the attorneys' heads.

## IV.

■ In sentencing Cherif under the sentencing guidelines, the district court began with the base offense level of 6 provided by Guideline § 2F1.1(a), the guideline for fraud and deceit. The court then increased the base level by 7 points because it found that Cherif and others to whom he had recommended stocks based on stolen information had made a total gain of between $201,000 and $500,000 from their trades. The table in § 2F1.1 in effect at the time of Cherif's scheme provided for a 7-level increase for frauds resulting in a loss of between $200,000 and $500,000. To justify using this gain to enhance the base offense level, the court referred to Guideline § 2F1.2, the guideline for insider trading, which tells courts to "[i]ncrease the number of levels from the table in § 2F1.1 corresponding to the gain resulting from the offense." Section 2F1.2(b)(1). The commentary to § 2F1.2 states that for insider trading offenses, "the gain, *i.e.*, the total increase in value realized through trading in securities by the defendants acting in concert with him or to whom he has provided inside information, is employed instead of the victims' losses."

Cherif argues that it was improper to refer to the insider trading guideline to enhance his sentence because he was not convicted of insider trading, and because the gains he received did not come from the victims of his crime (the bank and its customers) but from willing sellers in the open market. However, we think it was proper to refer to § 2F1.2 to use Cherif's gain to enhance his sentence. While it is true Cherif was not convicted of insider trading, the commentary to § 2F1.2 states that "certain other offenses ... that involve misuse of inside information for personal gain also may appropriately be covered by this guideline." Although Cherif was charged with mail and wire fraud, not insider trading, his conduct involved "misuse of inside information for personal gain," akin to insider trading. Any contention

otherwise would be difficult to reconcile with our decision in a related case that Cherif's scheme to steal information and trade on it violated SEC Rule 10b–5 under a misappropriation theory, an offshoot of the classical insider trading theory. See *SEC v. Cherif*, 933 F.2d at 407–12.

Moreover, even though the loss here might only have been to the bank and its customers, it was appropriate to use Cherif's gain as a measure for that loss. There was a loss to the bank and its customers but that loss is difficult to quantify. The whole point of § 2F1.2 is to allow the court to place a monetary value on losses that are hard to identify. Cherif's scheme was designed to make money (for himself and his friends) trading stocks. To disregard the gains Cherif made from his scheme would be to disregard an essential part of his scheme and understate the seriousness of Cherif's crime.

Cherif also argues that even if it was proper to enhance his sentence based on trading gains, the only gains the court should have considered were his own, not those of others to whom he recommended trades. We disagree. The commentary to § 2F1.2 says to count gains made by those "to whom [the defendant] provided inside information." It may be, as Cherif argues, that there was not evidence that Cherif specifically related inside information (e.g., "the bank is financing a takeover of XYZ Co.") to his trading partners. But it is not a stretch to say that by recommending the stocks he did, Cherif in effect did share the information with those people, if even only in the condensed form of "Buy XYZ Co. stock; it's going to go up." After all, the tip was based in large part on the information Cherif stole from the bank. Given that it was proper to count others' gains, we have no trouble concluding that the district court's finding of a total gain greater than $200,000 was not clearly erroneous.

Cherif raises two other challenges to his sentence. The first is a perfunctory and meritless argument that the district court should have deducted two points from his offense level for accepting responsibility (an argument that he has waived in

any event by raising for the first time in his reply brief). See *United States v. Wey*, 895 F.2d 429, 430 (7th Cir.1990). The second is that the district court erred by enhancing his offense level by two levels for obstructing justice. See Guideline § 3C1.1. The district court based the enhancement on a letter Cherif wrote to Reiter immediately after his interview with the FBI agents in which he stated to Reiter that she "could not know anything about deals or stock," and "You know you're innocent and there is no way conceivable that you could have known anything about anything." Both of these statements were false, according to Reiter. The district court reasoned that the letter to Reiter was an attempt to influence her to lie to the FBI, and ruled that such an attempt amounted to an attempt to obstruct justice.

Even viewing the letter favorably to Cherif, it was reasonable to conclude Cherif was attempting to influence Reiter to lie. The letter came hot on the heels of Cherif's own interview with the FBI, an interview in which he himself lied to the agents. Reiter testified at trial that she was not "innocent": she knew generally about Cherif's forays into the bank, his obtaining of information, and his trading on information, and she had even obtained a document for Cherif to help him out. Cherif could have been under no illusion that Reiter did not know what was going on. Moreover, Reiter herself would know whether she knew about the scheme; Cherif did not have to tell her. Why else, then, write a letter telling Reiter she did not know anything, except as a subtle and somewhat clever attempt to tell her, "Don't spill the beans." We agree with the district court that such an attempt to influence a potential witness is an attempt to obstruct justice under § 3C1.1. Cf. *United States v. Fozo*, 904 F.2d 1166, 1172 (7th Cir.1990).

For the above reasons, we affirm Cherif's convictions and sentence.

AFFIRMED.